Sherman L. ROBERSON, Plaintiff,

v.

William N. DALE, Individually, Sonja H. Stone, Individually and in her official capacity as director of Afro-American Studies and Southeastern Black Press Institute, the University of North Carolina at Chapel Hill, Samuel R. Williamson, Jr., Individually and in his official capacity as Dean of the College of Arts and Sciences, the University of North Carolina at Chapel Hill, N. Ferebee Taylor, in his official capacity as Chancellor, the University of North Carolina at Chapel Hill, William C. Friday, in his official capacity as President of the University of North Carolina, Thomas W. Lambeth, in his official capacity as Chairman of the Board of Trustees, the University of North Carolina at Chapel Hill, William A. Johnson, in his official capacity as Chairman of the Board of Governors of the University of North Carolina, and the University of North Carolina at Chapel Hill, Defendants.

No. C–78–345–D.

United States District Court,
M. D. North Carolina,
Durham Division.

Jan. 31, 1979.

Charles R. Coleman of Lee & Lee, High Point, N. C., for plaintiff.

Marvin Schiller, Asst. Atty. Gen., Edwin M. Speas, Jr., Special Deputy Atty. Gen., Raleigh, N. C., for Dale.

Sheila R. Benninger, Cooper & Williams, P. A., Chapel Hill, N. C., for other defendants.

## MEMORANDUM OPINION AND ORDER

HIRAM H. WARD, District Judge.

This case is before the Court on the defendants' motions to dismiss, Rule 12(b), Federal Rules of Civil Procedure. For the reasons set out below, the motions will be granted.

Plaintiff Sherman L. Roberson alleges in his complaint that in May 1978 agents of the University of North Carolina at Chapel Hill (UNC–CH) offered him a job as the Director of UNC–CH's Afro-American Studies and Southeastern Black Press Institute; that he accepted the offer; and that UNC–CH then reneged on its offer. He also alleges that, after accepting UNC–CH's offer, he leased a house from defendant William Dale, and that Dale then leased the house to a third party. Dale is not employed by or otherwise connected with UNC–CH, and it is not alleged that he participated in UNC–CH's breach of the employment contract. Roberson has apparently joined him as a matter of convenience.[1] *See* Rule 20(a), Federal Rules of Civil Procedure.

Roberson has sued eight defendants: Dale, UNC–CH, and six individuals employed by either UNC–CH or UNC–CH's parent, the University of North Carolina (UNC).[2] *See* N.C.Gen.Stat. § 116–1 *et seq.*

1. Roberson alleges in his complaint that the defendants are liable "jointly, severally an [sic] in the alternative," but this is plainly not so since Dale's liability does not arise out of the same transaction, occurrence, or series of

transactions or occurrences that created UNC–CH's alleged liability. Rule 20(a), Fed.R.Civ.P.

2. The six individual defendants are (1) Sonja Stone, Director of the Afro-American Studies

He contends Dale is liable for breach of the lease agreement. He further contends the other defendants are liable for (1) breach of the employment contract; (2) violation of "Plaintiff's state created rights in . . . tort;" (3) restraint of commerce, in violation of Article I of the United States Constitution; (4) interference with plaintiff's right to travel, in violation of the Fifth Amendment to the United States Constitution; and (5) impairing the obligation of contracts, in violation of Article I of the United States Constitution.[3] Roberson, who is a New York resident, asserts that this Court has jurisdiction over his claim against Dale, who is a North Carolina resident, by virtue of 28 U.S.C. § 1332 (diversity of citizenship). He contends the Court has jurisdiction over his suit against the other defendants under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1332, and 28 U.S.C. § 1337 (Acts of Congress regulating commerce).

*Dale's Motion to Dismiss*

Defendant William Dale has moved to dismiss Roberson's breach of contract claim on the ground that this Court lacks subject matter jurisdiction, Rule 12(b)(1), Federal Rules of Civil Procedure. Dale contends that, although there is diversity of citizenship between the parties, there is not $10,-000 in controversy, as required by 28 U.S.C. § 1332.

■ Ordinarily, a diversity plaintiff's statement of the amount in controversy is accepted at face value. *Gibbs v. Buck*, 307 U.S. 66, 72, 59 S.Ct. 725, 729, 83 L.Ed. 1111, 1115 (1939). When, however, the defendant challenges the plaintiff's statement, the plaintiff must show that it does not "appear to a legal certainty that [his] claim is really for less than the jurisdictional amount . . . ." *Saint Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 289, 58 S.Ct. 586, 590, 82 L.Ed. 845, 848 (1938). In judging whether a plaintiff has met this test, a federal district court applies federal standards. Where, as here, an action turns on state law, the federal court also looks "to state law to determine the nature and extent of the right to be enforced." This includes applying the forum state's rules regarding the measure of damages and the availability of special and punitive damages. *Horton v. Liberty Mutual Insurance Co.*, 367 U.S. 348, 352, 81 S.Ct. 1570, 1573, 6 L.Ed.2d 890, 894 (1961). *See* 14 Wright and Miller, *Federal Practice and Procedure* § 3702 at 373–76 (1976).

■ Under North Carolina law, the measure of general damages for breach of contract is that amount which places the injured party in the same monetary condition he would have been in had the contract not been breached. *Weyerhaeuser Co. v. Godwin Building Supply Co., Inc.*, 292 N.C. 557, 560, 234 S.E.2d 605, 607 (1977); *Norwood v. Carter*, 242 N.C. 152, 155, 87 S.E.2d 2, 4 (1955). Special damages are recoverable if they are foreseeable at the time the contract is formed. Damages are reasonably foreseeable if they arise naturally or according to the usual course of things from the breach of the contract. *Troitino v. Goodman*, 225 N.C. 406, 412, 35 S.E.2d 277, 281 (1945). Where the breached contract

---

and Southeastern Black Press Institute of UNC–CH; (2) Samuel Williamson, Dean of the College of Arts and Sciences at UNC–CH; (3) Ferebee Taylor, Chancellor of UNC–CH, *see* N.C.Gen.Stat. § 116–34; (4) Thomas Lambeth, Chairman of the Board of Trustees of UNC–CH, see N.C.Gen.Stat. §§ 116–31 – 116–33; (5) William Friday, President of UNC, *see* N.C. Gen.Stat. § 116–14; and (6) William Johnson, Chairman of the Board of Governors of UNC, *see* N.C.Gen.Stat. §§ 116–3 – 116–10. Defendants Stone and Williamson are being sued individually and in their official capacities; defendants Taylor, Lambeth, Friday, and Johnson are being sued only in their official capacities.

3. Roberson's complaint could be read to also assert a claim under North Carolina's unfair and deceptive trade practices law, N.C.Gen. Stat. § 75–1 *et seq. See* Complaint at 7–8. A reading of the statute reveals, however, that Roberson cannot state a claim for relief under its provisions. The statute regulates conduct between *businesses* and between sellers or lenders and *consumers*; it has no application to contracts between employers and employees.

was commercial and not personal,[4] the plaintiff may not recover special damages for mental anguish. *Lamm v. Shingleton*, 231 N.C. 10, 12–15, 55 S.E.2d 810, 812–13 (1949). Moreover, punitive damages are not recoverable for breach of contract. *King v. Insurance Co. of North America*, 273 N.C. 396, 159 S.E.2d 891 (1968); *Swinton v. Savoy Realty*, 236 N.C. 723, 73 S.E.2d 785 (1953).

■ Applying these rules here, it is at once apparent to a legal certainty that Roberson cannot recover $10,000 from Dale. Roberson's general damages would be no more than $540: the difference between the contract rental price ($325 per month) and the cost of renting comparable quarters elsewhere ($370 per month)[5] times 12 (months). Roberson contends that he has suffered special damages in excess of $10,000, but an examination of the alleged damages reveals that most could not be recovered for breach of a non-personal contract to employ in North Carolina.[6] Giving Roberson the benefit of every doubt, this Court can find no more than $8,721 in special damages that could conceivably be recovered from Dale.[7] Roberson's total alleged damages therefore fall short of the $10,000 jurisdictional requirement of 28 U.S.C. § 1332.[8]

■ This Court is therefore without jurisdiction to hear Roberson's contract claim against Dale. He can bring this lawsuit only in state court. Dale's motion to dismiss will be granted.[9] Rule 12(b)(1), Federal Rules of Civil Procedure.

4. Contracts are "personal" when they are so coupled with matters of mental concern or with the sensibilities of the party to whom the duty is owed that their breach can reasonably be expected to result in mental anguish. *Lamm v. Shingleton*, 231 N.C. 10, 12–15, 55 S.E.2d 810, 812–13 (1949). Examples of "personal" contracts are contracts to send a message by telegram and contracts to perform a burial. *See, e. g., Carmichael v. Bell Telephone Co.*, 157 N.C. 21, 25, 72 S.E. 619, 621 (1911).

5. This $370 figure is the alleged rental cost in *New York* not Chapel Hill, North Carolina. Although North Carolina courts would undoubtedly refuse to accept such a figure as the proper measure for general damages, this Court accepts it for the purpose of Dale's motion.

6. Roberson alleged the following unrecoverable special damages: (1) pain and suffering and mental anxiety, *see Lamm v. Shingleton*, 231 N.C. 10, 55 S.E.2d 810 (1949); (2) shipping costs incurred moving family belongings from New York to Chapel Hill and back again; (3) rental costs for a trailer to move family belongings to Chapel Hill; (4) storage fees for the family dog; (5) loss of school time by Roberson's children; (6) highway tolls; (7) car rental; (8) gasoline costs; (9) legal fees for prosecuting this case, *see Jacobs v. Tawes*, 250 F.2d 611, 613 (4th Cir. 1957); (10) television rental; (11) the cost of new household furnishings. UNC–CH, not Dale, *caused* Roberson to incur the shipping costs, the trailer, car, and television rentals, the highway tolls, and the gasoline costs. *See* D. Dobbs, *Law of Remedies*, 799–801 (1973); *see also Lekas & Drivas, Inc. v. Goulandris*, 306 F.2d 426 (2d Cir. 1962); *Krauss v. Greenbarg*, 137 F.2d 569 (3d Cir.), *cert. denied*, 320 U.S. 791, 64 S.Ct. 207, 88 L.Ed. 477 (1943). As a matter of North Carolina law,

Dale cannot be said to have foreseen that his breach of the lease agreement would cause Roberson to incur expenses for dog storage and new furnishings. *Troitino v. Goodman*, 225 N.C. 406, 412, 35 S.E.2d 277, 281 (1945). It is of no significance here that some of these injuries may be "continuing." *Cf. Broglie v. MacKay-Smith*, 541 F.2d 453 (4th Cir. 1976) (jurisdictional amount satisfied by expenses incurred after complaint filed).

7. Roberson alleged the following special damages that could conceivably be recovered under North Carolina law: (1) cost of storing belongings in Chapel Hill ($105); (2) damage to stored goods ($2,650); (3) motel, house rental, and food expenses incurred after arriving in Chapel Hill and finding the house occupied ($5,465.82); and (4) broker's fees and other expenses of finding other lodgings ($500).

8. It should be emphasized that this Court has been overly generous in computing Roberson's recoverable damages. Thus, Roberson should take little solace from the Court's finding that he could conceivably recover $9,261 from Dale. That figure would be reduced considerably if Roberson were required to provide exact damage allegations (which he has not done) and to conform those allegations to North Carolina's damages rules for breach of contract. (Also, a plaintiff must mitigate his damages). There was no reason to make a more exacting review of Roberson's recoverable damages, since, on the basis of Roberson's own figures, those damages were less than $10,000.

9. Dale has cross-claimed against defendants Stone, Williamson, and UNC–CH. They, in turn, have moved to dismiss the cross-claim for

*The Remaining Defendants' Motion to Dismiss*

The remaining defendants have moved to dismiss on the grounds that, except for the contract claim, Roberson has not stated a claim for which relief can be granted, Rule 12(b)(6), Federal Rules of Civil Procedure, and that, as to the contract claim, this Court lacks subject matter jurisdiction, Rule 12(b)(1), Federal Rules of Civil Procedure, because the requirements of 28 U.S.C. § 1332 have not been met.

█ It can be said without discussion that Roberson has not stated a claim for violation of the Constitutional prohibitions of restraining commerce, interference with Roberson's right to travel, and impairing the obligation of contracts. These claims are patently ridiculous; they have served only to waste the Court's time.

█ Roberson has also failed to state a tort claim under North Carolina law. At various places in his complaint, Roberson says that some or all of the defendants "violate[d] plaintiff's state created rights in . . . tort," "ratified the breach [of contract] in bad faith," negligently failed to disclose the conditional nature of the offer, and "advanced [the contract] in bad faith" so as to "misrepresent." These contentions, even when taken in their most favorable light, are mere epithets and do not state a claim for any recognizable tort in North Carolina. *See Newton v. Standard Fire Insurance Co.,* 291 N.C. 105, 113, 229 S.E.2d 297, 302 (1976) (no tort claim stated where plaintiff alleged "heedless, wanton and oppressive conduct" of defendant in failing to pay claim); *King v. Insurance Co. of North America,* 273 N.C. 396, 397, 159 S.E.2d 891, 893 (1968) (no tort claim stated where plaintiff alleged defendant's refusal to defend was "wilful," "intentional," "wanton," and "calculated . . . to hamper, prevent

and impair the plaintiff's legal position"); *Smith v. Hefner,* 235 N.C. 1, 7, 68 S.E.2d 783, 788 (1952) (defendant officials' conduct had to be "corrupt or malicious" or beyond the scope of their authority); *Pue v. Hood,* 222 N.C. 310, 315, 22 S.E.2d 896, 900 (1942).

█ Moreover, under North Carolina law, Roberson cannot state a claim for breach of contract against the individual defendants Stone, Williamson, Taylor, Lambeth, Friday, and Johnson, who, according to the complaint, were acting as "agents, officer[s] and employees" of either UNC–CH or the parent UNC. "[W]hen a contract is made with a known agent, acting within the scope of his authority for a disclosed principal, the contract is that of the principal alone. *Jenkins v. City of Henderson,* 214 N.C. 244, 247, 199 S.E. 37, 39 (1938)." *Smith v. State,* 289 N.C. 303, 332, 222 S.E.2d 412, 431 (1976).

The Court will therefore grant the defendants' motion to dismiss for failure to state a claim, Rule 12(b)(6), Federal Rules of Civil Procedure, as it relates to all of Roberson's claims except that for breach of contract.

Thus, Roberson's suit is reduced to what it should have begun as: a suit against UNC–CH and UNC [10] for breach of a contract to employ. These remaining defendants argue, however, that this Court is without jurisdiction to hear such a claim since there is no diversity of citizenship between the parties, as required by 28 U.S.C. § 1332,[11] and since Roberson can assert no other jurisdictional justification for suing in federal court. The Court agrees that its only arguable jurisdiction over this case lies in 28 U.S.C. § 1332 and now turns to UNC–CH's and UNC's diversity argument.

lack of subject matter jurisdiction. Rule 12(b)(1), Fed.R.Civ.P. It is now unnecessary to rule on the motion since Dale will no longer be a party to Roberson's action.

**10.** Roberson has not named UNC as a defendant, choosing instead to name officers of UNC who are not proper parties. *See* discussion

*supra.* Since the Court would, in its discretion, allow Roberson to amend his complaint, it will refer to UNC as a party defendant.

**11.** The defendants do not contest Roberson's assertion that, as to the employment contract claim, there is more than $10,000 in controversy.

UNC–CH and UNC contend they are agents or "alter-egos" of the State of North Carolina and that the State alone is the real defendant party in interest. It follows, they argue, that there is no diversity of citizenship between the parties, and thus no jurisdiction in this Court, since a state is not a "citizen" for the purpose of diversity of citizenship jurisdiction. *See* 28 U.S.C. § 1332(a). In a variant of their "alter-ego" argument, they also point to the Eleventh Amendment's absolute bar to suits in federal courts "against one of the United States by citizens of another State . . . ."[12]

 It is well settled that a state is not a "citizen" within the meaning of 28 U.S.C. § 1332(a).[13] *Moor v. County of Alameda*, 411 U.S. 693, 717, 93 S.Ct. 1785, 1799, 36 L.Ed.2d 596, 614 (1973); *Postal Telegraph Cable Co. v. Alabama*, 155 U.S. 482, 487, 15 S.Ct. 192, 194, 39 L.Ed. 231, 232–33 (1894). It is also settled law that a federal court has no jurisdiction under 28 U.S.C. § 1332 to hear a case where the defendant is merely an alter-ego of a state. *West Virginia v. Haynes*, 348 F.Supp. 1374 (S.D.W.Va.1972); *County of Harris v. Ideal Cement Co.*, 290 F.Supp. 956 (S.D.Tex.1968); see 13 Wright and Miller § 3524 at 85–92, § 3602 at 600, and § 3623 at 770–71. What is not clear, however, is whether UNC–CH and UNC are in fact "alter-egos" of the State of North Carolina.

 Other courts facing this "alter-ego" issue have considered numerous factors. A particularly good list of those factors is set out in *Krisel v. Duran*, 258 F.Supp. 845 (S.D.N.Y.1966), *aff'd*, 386 F.2d 179 (2d Cir. 1967), *cert. denied*, 390 U.S. 1042, 88 S.Ct. 1635, 20 L.Ed.2d 303 (1968). After stating that the "alter-ego" issue was controlled by federal law, the Court went on to say:

**12.** The Court need not address the defendants' Eleventh Amendment argument since it turns on precisely the same considerations as the non-constitutional argument that there is no diversity of citizenship. *But see* footnote 15 *infra*.

**13.** Moreover, a state cannot waive its non-"citizen" status or otherwise consent to be sued

However, local law and decisions defining the status and nature of the agency involved in its relation to the sovereign are factors to be considered, but only one of a number that are of significance.

Among the other factors, no one of which is conclusive, perhaps the most important is whether, in the event plaintiff prevails, the payment of the judgment will have to be made out of the state treasury; significant here also is whether the agency has the funds or the power to satisfy the judgment. Other relevant factors are whether the agency is performing a governmental or proprietary function; whether it has been separately incorporated; the degree of autonomy over its operations; whether it has the power to sue and be sued and to enter into contracts; whether its property is immune from state taxation, and whether the sovereign has immunized itself from responsibility for the agency's operations. 258 F.Supp. at 849.

Also worthy of note is this comment from a leading treatise on federal civil procedure:

The central factor in the final determination appears to be the degree of autonomy of the governmental entity with respect to the particular matters at issue; if the governmental unit simply is functioning as the alter ego of the state in accomplishing some public purpose, it will be treated as the state for purposes of the Eleventh Amendment. 13 Wright and Miller § 3524 at 89.

*See also Soni v. Board of Trustees*, 513 F.2d 347, 352 (6th Cir. 1975), *cert. denied*, 426 U.S. 919, 96 S.Ct. 2623, 49 L.Ed.2d 372 (1976); *DeLong Corp. v. Oregon State Highway Commission*, 233 F.Supp. 7 (D.Or. 1964), *aff'd*, 343 F.2d 911 (9th Cir.), *cert. denied*, 382 U.S. 877, 86 S.Ct. 161, 15 L.Ed.2d 119 (1965). Applying the teachings

where 28 U.S.C. § 1332 is the jurisdictional base. *State Highway Commission v. Utah Construction Co.*, 278 U.S. 194, 199–200, 49 S.Ct. 104, 105–106, 73 L.Ed. 262, 264 (1929); *George R. Whitten, Jr., Inc. v. State University Construction Fund*, 493 F.2d 177, 179 n.2 (1st Cir. 1974).

of these authorities here, the Court concludes that UNC–CH and UNC are "alter-egos" of the State of North Carolina.

The University of North Carolina is established and defined in N.C.Gen.Stat. § 116–1 *et seq.* The University's declared purpose is to coordinate the state's system of higher education. § 116–1. To this end, it is made "a body politic [14] and corporate" able "to sue and be sued in all courts whatsoever; [15] . . . and in general . . do all such things as are usually done by bodies corporate and politic, or such as may be necessary for the promotion of learning and virtue." § 116–3.

The University is governed by a Board of Governors, whose members are elected by the State Senate and House of Representatives. § 116–6. Many of the Board's general powers and duties suggest that its function is primarily "governmental." For instance, it is to prepare "a long-range plan for a coordinated system of higher education," § 116–11(1), and "present to the Governor, the Advisory Budget Commission and the General Assembly a single, unified recommended budget," § 116–11(9)(a). It may also "acquire, hold, convey or otherwise dispose of, invest and reinvest any and all real and personal property . . . ." § 116–11(2). This last power—to generally manage the University's real and personal property—is tempered by a subsequent provision, § 116–13, which requires that such power be exercised in accord with statutory provisions regulating the management of *state* monies and real and personal property. *See* N.C.Gen.Stat. §§ 143–1 *et seq.* and 146–1 *et seq.* Also indicative of UNC's

"alter-ego" character is § 116–16 which makes UNC's property tax exempt. Moreover, no provision in the entire chapter or any other chapter of North Carolina's statutes exempts the State from UNC's general debts or liabilities. *Cf.* § 116–221 (explicit state disclaimer of waiver of sovereign immunity where UNC has written a "self-insurance program" for its medical institutions).[16]

To be sure, numerous provisions in N.C. Gen.Stat. § 116–1 *et seq.* grant UNC and its constituent universities, such as UNC–CH, considerable autonomy. The constituent universities, for instance, are authorized to sell electricity to people in their communities. § 116–35. They may also establish endowment funds to "supplement the State appropriations." § 116–36(b). Moreover, the trustees of these funds may manage the fund's property free of the restrictions routinely placed on the "acquisition, operation, maintenance and disposition" of state property. § 116–36(g); *see also* N.C.Gen.Stat. §§ 116–13, 143–1 *et seq.*, and 146–1 *et seq.* The section giving the trustees this freedom also provides, however, "that any expense or financial obligation *of the State of North Carolina created by any acquisition or disposition . . .* of any real or personal property of the endowment fund shall be borne by the endowment fund unless" the state Advisory Budget Commission has authorized satisfaction from some other source. § 116–36(g) (emphasis added). Such language again suggests that, regardless of their autonomy, UNC and its constituent universities are managing *state* monies and property.

---

**14.** In *Student Bar Association v. Byrd*, 293 N.C. 594, 601, 239 S.E.2d 415, 420 (1977), the North Carolina Supreme Court defined the term "body politic," in the context of the state's open meeting law, N.C.Gen.Stat. § 143–318.2, as "a body acting as government; *i. e.*, exercising powers which pertain exclusively to a government . . . ."

**15.** This "sue and be sued" language suggests that the state has waived its Eleventh Amendment immunity in cases such as Roberson's. Indeed, the North Carolina Supreme Court recently held that the state may no longer assert the defense of sovereign immunity in

breach of contract cases. *Smith v. State*, 289 N.C. 303, 222 S.E.2d 412 (1976). The language of § 116–3 and the holding of *State v. Smith* are of no significance here, however, since neither affects the rule that a state is not a "citizen" within the meaning of the diversity of citizenship statute, 28 U.S.C. § 1332. *O'Neill v. Early*, 208 F.2d 286 (4th Cir. 1953).

**16.** *See generally* C. Daye, *North Carolina's New Administrative Procedure Act*, 53 N.C.L. Rev. 833, 842–43 n.44 (1975), where the author concludes that the General Assembly included UNC within its definition of a state "agency."

The Board of Governors is authorized to issue revenue bonds to pay for such projects as services, housing, and physical education facilities. *See* §§ 116–41.1, 116–175, and 116–187. The statute provides that the bonds "shall not be deemed to constitute a debt of the State of North Carolina." § 116–41.4; *see also* §§ 116–176 and 116–188. Thus, the State has separated itself from UNC for the specific purpose of avoiding liability for the university's management of revenue bonds. There is no other such disclaimer of liability anywhere else in § 116–1 *et seq.*

The courts of North Carolina have never addressed the "alter-ago" character of UNC. *See generally, Student Bar Association v. Byrd*, 293 N.C. 594, 239 S.E.2d 415 (1977); *University of North Carolina v. Carrboro*, 15 N.C.App. 501, 190 S.E.2d 231, *cert. denied*, 282 N.C. 155, 191 S.E.2d 602 (1972). They have, however, examined the "alter-ego" status of other state agencies. The language in those cases suggests that, if confronted with the question, the courts would find that UNC is the state's "alter-ego."

Stating the general rule, the Supreme Court of North Carolina has held that "[a]n action against a Commission or Board created by Statute as an agency of the State where the interest or rights of the State are directly affected is in fact an action against the State." *Prudential Insurance Co. v. Powell*, 217 N.C. 495, 500, 8 S.E.2d 619, 622 (1940). The court has also said that a "suit against an agency which represents the state in action and liability, to control such action and liability, is in effect a suit against the state." *Vinson v. O'Berry*, 209 N.C. 287, 183 S.E. 423 (1936). *See also Smith v. Hefner*, 235 N.C. 1, 6, 68 S.E.2d 783, 787 (1952) (an "agency exercising statutory governmental functions like a city administrative school unit, may be sued only when . . . authorized by statute").

With one exception, the North Carolina courts have always applied these general rules to find that the defendant agency, association, commission, or board is the "alter-ego" of the state. *See e. g., Nat Harrison Associates, Inc. v. North Carolina State Ports Authority*, 280 N.C. 251, 185 S.E.2d 793 (1972); *Smith v. Hefner*, 235 N.C. 1, 68 S.E.2d 783 (1952) (city administrative school unit); *Carroll v. North Carolina State Firemen's Association*, 230 N.C. 436, 53 S.E.2d 524 (1949); *Schloss v. State Highway & Public Works Commission*, 230 N.C. 489, 53 S.E.2d 517 (1949);[17] *Prudential Insurance Co. v. Powell*, 217 N.C. 495, 8 S.E.2d 619 (1940) (Unemployment Compensation Commission); *Benton v. Board of Education of Cumberland County*, 201 N.C. 653, 161 S.E. 96 (1931); *Granville County Board of Education v. State Board of Education*, 106 N.C. 81, 10 S.E. 1002 (1890). In the one instance where the defendant organization was held to be beyond sovereign immunity protection, the court found that: the majority of managing board members were not selected by any state agency; the board members who were state officials performed only ministerial duties; and the board received and managed monies "that [did] not belong to the State and in which the State [had] no interest, and over which it [had] no control." *American Equitable Assurance Co. v. Gold*, 248 N.C. 288, 291, 103 S.E.2d 344, 347 (1958) (Fireman's Pension Fund). *Cf. Carroll v. North Carolina State Firemen's Association*, 230 N.C. 436, 53 S.E.2d 524 (1949). Neither the University of North Carolina nor any of its constituent universities possess any of these characteristics.

Federal Courts which have considered the "alter-ego" relationship of a state university to its state have usually concluded that a suit against the university is a suit against the state. *See, e. g., Jagnadan v. Giles*, 538 F.2d 1166 (5th Cir. 1976), *cert. denied*, 432 U.S. 910, 97 S.Ct. 2959, 53 L.Ed.2d 1083

---

**17.** In *Schloss v. State Highway & Public Works Commission*, the court described the defendant commission as "an inanimate, artificial creature of statute. Its form, shape, and authority are defined by the Act by which it was created. It is as powerless to exceed its authority as is a robot to act beyond the limitations imposed by its own mechanism." 230 N.C. at 492, 53 S.E.2d at 519.

(1977). *Brennan v. University of Kansas,* 451 F.2d 1287 (10th Cir. 1971); *Walstad v. University of Minnesota Hospitals,* 442 F.2d 634 (8th Cir. 1971); *Hamilton Manufacturing Co. v. Trustees of the State Colleges in Colorado,* 356 F.2d 599 (10th Cir. 1966). *See also Soni v. Board of Trustees of University of Tennessee,* 513 F.2d 347 (6th Cir. 1975) (and cases cited therein). *Cf. Hopkins v. Clemson Agricultural College of South Carolina,* 221 U.S. 636, 31 S.Ct. 654, 55 L.Ed. 890 (1911) (defendant incorporated state college could be sued for its *tort*). This Court has found only two cases where universities have been held not to be "alter-egos" of the state. In *Gordenstein v. University of Delaware,* 381 F.Supp. 718 (D.Del.1974), the court based its holding on the state treasury's insulation from a judgment against the university, the monetary and legal ability of the university to pay a judgment, and the university's fiscal and educational autonomy. 381 F.Supp. at 722. In *Dyson v. Lavery,* 417 F.Supp. 103 (E.D. Va.1976), the Court concluded that the defendant university could pay a judgment from its student tuition fees and that those fees were neither earmarked for specific projects nor related to state appropriation funds. 417 F.Supp. at 109. Both holdings can be distinguished by their reliance on statutory language not present in N.C.Gen. Stat. § 116–1 *et seq.* In any event, this Court believes that, contrary to the apparent logic of *Dyson v. Lavery,* monies can become "state monies" regardless of whether they actually pass through the state treasury.

It is true that UNC and UNC–CH receive monies from sources other than the North Carolina General Assembly. Gifts, endowment fund profits, and tuition payments are examples. The universities also have the authority to manage those monies. But it is clear from the creating statute, § 116–1 *et seq.,* that the university's property and monies are nevertheless *state* property, wholly within the control of the legislature. Indeed, the State Executive Budget Act, § 143–1 *et seq.,* defines "state funds" as "any and all moneys appropriated by the General Assembly of North Carolina, *or*

moneys collected by or for the State, or any agency thereof." § 143–1 (emphasis added). This Court therefore concludes that although UNC and UNC–CH might have the *power* to satisfy any judgment won by Roberson, such judgment would inevitably be paid from "public funds." *See Edelman v. Jordan,* 415 U.S. 651, 653, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662, 673 (1974); *Ford Motor Co. v. Department of Treasury,* 323 U.S. 459, 464, 65 S.Ct. 347, 350, 89 L.Ed. 389, 394 (1945).

Moreover, the Court finds that with respect to the particular matter at issue here—the hiring of a university faculty member—UNC and UNC–CH act to accomplish a public rather than a proprietary purpose. *See* 13 Wright and Miller § 3524 at 89. Article IX, § 8 of North Carolina's Constitution declares that "[t]he General Assembly shall maintain a public system of higher education, comprising the University of North Carolina . . . ." It follows that when UNC hires a person to teach its students, and to fulfill the state's constitutional command, it is acting as the agent of the General Assembly and not in its own monetary interest.

The Court holds that UNC and UNC–CH are "alter-egos" of the State of North Carolina and that the state is therefore the real defendant party in interest in this action. Diversity of citizenship between the parties is consequently lacking. The claim may be pursued only in state court. The motion to dismiss for lack of subject matter jurisdiction, Rule 12(b)(1), Federal Rules of Civil Procedure, will be granted.

IT IS THEREFORE ORDERED that defendant William Dale's motion to dismiss plaintiff Sherman Roberson's action, pursuant to Rule 12(b), Federal Rules of Civil Procedure, be, and the same hereby is, GRANTED. IT IS FURTHER ORDERED that the joint motion of defendants Sonja Stone, Samuel Williamson, Ferebee Taylor, William Friday, Thomas Lambeth, William Johnson, and the University of North Carolina at Chapel Hill to dismiss plaintiff Sherman Roberson's action, pursuant to Rule 12(b), Federal Rules of Civil Procedure, be,

and the same hereby is, GRANTED. An Order of Dismissal will be entered accordingly.