The **BOARD OF GOVERNORS OF the UNIVERSITY OF NORTH CAROLINA, and The University of North Carolina at Chapel Hill, Plaintiffs,**

v.

Charles **HELPINGSTINE, Johnny T–Shirt, JTS Promotions, and Michael W. Helpingstine, Defendants.**

Civ. No. C–87–447–D.

United States District Court, M.D. North Carolina, Durham Division.

Jan. 9, 1989.

Edwin M. Speas, Jr., Kaye R. Webb, N.C. Dept. of Justice, Raleigh, N.C., for plaintiffs.

Larry L. Coats, David E. Bennett, Raleigh, N.C., for defendants.

Bruce O. Baumgartner, R. Scott Keller, Baker & Hostetler, Cleveland, Ohio, CCI/ICE—amicus curiae atty.

## MEMORANDUM OPINION

BULLOCK, District Judge.

Plaintiffs instituted this action against Defendants under the Lanham Act, specifically 15 U.S.C. §§ 1114 and 1125, and N.C. Gen.Stat. § 75–1.1, alleging trademark infringement, false designation of source or origin, and unfair and deceptive trade practices. Defendants denied such practices and brought counterclaims under the Sherman Act, 15 U.S.C. § 1, and N.C.Gen.Stat. §§ 66–58 and 75–1.1, asserting restraint of trade, unlawful competition with state citizens in the sale of goods, and unfair and deceptive trade practices. Defendants also claimed that their activities were protected by the First Amendment to the United States Constitution.

Defendants have moved for summary judgment on their claims under N.C.Gen.

Stat. § 66–58 and Plaintiffs' claims under the Lanham Act. Plaintiffs have countered with their own motion for summary judgment on their trademark infringement claim as well as all of the Defendants' counterclaims. For the reasons stated below, summary judgment will be denied on both parties' motions regarding the alleged Lanham Act violations; summary judgment will also be denied on Defendants' motion on their claim under N.C.Gen.Stat. § 66–58. However, summary judgment will be granted for Plaintiffs on all of the Defendants' counterclaims.

## STATEMENT OF FACTS

The record reveals the following facts to be undisputed:

The University of North Carolina is comprised of sixteen institutions including its main campus at Chapel Hill (hereinafter "UNC–CH"). UNC–CH opened its doors to students in 1795 and has developed a tradition of excellence with regard to both its academic and athletic programs.

As the University's reputation expanded, a market emerged for items bearing the University's name, symbols, and insignia. Prior to 1982, the University made no efforts to license the manufacture and retail sale of such items. By the University's own admission, at least 107 suppliers and 79 manufacturers were users of the symbols in 1982.

However, in late 1982, the University, prompted in large measure by the proliferation of collegiate products, decided to develop and implement a trademark licensing program. As part of this program UNC–CH registered four trademarks with the United States Patent and Trademark Office: (1) the University seal; (2) the letters "UNC"; (3) the words "University of North Carolina"; and (4) the Tarheel foot. Also, effective October 1, 1982, UNC–CH granted to Golden Eagle Enterprises (now Collegiate Concepts, Inc.) the "right to use and the exclusive right to grant sub-licenses" to use its registered trademarks "on merchandise sold in the United States" in the manner set forth in the agreement. This agreement is currently in full force and effect, and today approximately 225 manufacturers have been licensed under the agreement.

Licensing is not automatic, though; instead, applications are reviewed by UNC–CH officers who approve or disapprove of the applications according to criteria developed in 1982. These criteria include whether the merchandise is offensive, whether the use of the merchandise might result in injury, whether the use of the merchandise would suggest University sponsorship, and whether the price of the merchandise is commensurate with its quality. Products which have been rejected under these criteria include items promoting alcoholic beverage consumption, play football helmets, and blankets and other merchandise with a high degree of flammability.

In August 1983 the Defendants Helpingstine opened Johnny T–Shirt, a retail shop in Chapel Hill, North Carolina. The business was incorporated in January of 1987 and currently employs between twenty and forty persons in various capacities. Its gross sales revenue for 1986, the most recent figure before this court, was $621,681.05.

Johnny T–Shirt sells collegiate merchandise, fraternity and sorority merchandise, and other types of apparel and merchandise to the public. It also imprints plain merchandise with various names, symbols, and other designs through various processes. Although UNC–CH and its licensing agent have offered on many occasions to grant Johnny T–Shirt a license to utilize the University's marks on apparel and other merchandise, Johnny T–Shirt has always refused to accept such license. Thus, since 1983 Johnny T–Shirt has never been nor is it now licensed to sell merchandise bearing UNC–CH's registered trademarks. However, it is undisputed that a large portion of the merchandise sold by Johnny T–Shirt bears UNC–CH's registered marks.

Defendant JTS Promotions is a companion business to Johnny T–Shirt, incorporated in October of 1986. JTS's primary business is the sale of advertising specialties. JTS has also sold items bearing UNC–CH's registered trademarks despite the fact that

it also is not licensed to sell such merchandise.

Defendants admit that they have sold goods bearing UNC's marks knowing that the University has a trademark program and that it has claimed trademark rights in the marks. Defendants have also added that they were aware of the trademark licensing program even before they opened Johnny T–Shirt in 1983. However, Defendants maintain that even with this knowledge and use they have not infringed UNC–CH's trademarks because the trademarks were abandoned through extensive non-licensed used prior to 1982, and also that even if such marks are valid UNC–CH has not established the requisite likelihood of confusion that is the hallmark of copyright infringement. These contentions are discussed below.

## DISCUSSION

### A. *Plaintiffs' Claim of Infringement of Trademark*

In determining the outcome of a trademark dispute, two questions must be addressed: first, does the plaintiff have a protectable property right in the name or mark it seeks to defend; and second, is defendant's use of a similar mark likely to cause confusion, mistake or deception in the market as to the source, origin, or sponsorship of the products on which the marks are used. *Security Center Ltd. v. First Nat'l Sec. Centers,* 750 F.2d 1295, 1298 (5th Cir.1985). If both of these questions are answered in the affirmative, then trademark infringement has been established. However, simply because the plaintiff has a valid trademark does not mean that another's use of a similar or even the same mark will always meet the likelihood-of-confusion test necessary to establish infringement.

Plaintiffs contend that as its marks are validly registered and there is no dispute that Johnny T–Shirt is using the exact marks registered by Plaintiffs, both elements of the test are met as a matter of law and thus UNC is entitled to summary judgment on its claims. Defendants contend, however, that as Plaintiffs abandoned

their trademark rights by allowing widespread uncontrolled use of the marks prior to 1982, they cannot now assert valid trademark rights in these marks. Alternatively, Defendants contend that their use does not create likelihood of confusion. Each prong of the test will be discussed below.

### 1. Plaintiffs' property right in marks

Under Section 7(b) of the Lanham Act, 15 U.S.C. § 1057(b), registration of a mark with the United States Patent and Trademark Office constitutes *prima facie* evidence that the registrant owns the mark and has the exclusive right to use the mark as well as that the registration itself is valid. As it is undisputed that UNC–CH has registered the four marks in question with the Patent and Trademark Office, it is entitled to the presumptions of Section 7(b). Several courts have recognized that both public and private institutions of higher education have a legitimate interest in protecting their names, logos, and other insignia and may register such marks. *See University of Georgia Athletic Ass'n v. Laite,* 756 F.2d 1535, 1540–41 (11th Cir. 1985); *University of Notre Dame du Lac v. J.C. Gourmet Foods Imports Co.,* 703 F.2d 1372, 1374 (Fed.Cir.1983); *University of Pittsburgh v. Champion Products,* 686 F.2d 1040, 1043 (3d Cir.), *cert. denied,* 459 U.S. 1087, 103 S.Ct. 571, 74 L.Ed.2d 933 (1982); *President and Trustees of Colby College v. Colby College–New Hampshire,* 508 F.2d 804, 808 (1st Cir.1975).

Defendants do not dispute that UNC–CH's registration of the marks in question constitutes *prima facie* evidence of their validity, but they point out that the presumptions of Section 7(b) are rebuttable. *See WSM, Inc. v. Hilton,* 724 F.2d 1320, 1326 (8th Cir.1984) (presumption created by Lanham Act is a rebuttable one which shifts burden to the one questioning the trademark); *Vision Center v. Opticks, Inc.,* 596 F.2d 111, 119 (5th Cir.1979), *cert. denied,* 444 U.S. 1016, 100 S.Ct. 668, 62 L.Ed.2d 646 (1980) (although Lanham Act provides statutory presumption of validity to registered marks, presumption is rebuttable). Defendants maintain that they

have rebutted the presumptions in this case through evidence that the University abandoned its rights in the marks at issue. Defendants assert that this abandonment occurred in two interrelated ways—first, by UNC–CH's failure to prosecute those individuals who used its marks prior to 1982; and, second, by UNC–CH's allowance of substantial uncontrolled use of the marks prior to 1982.

■ Defendants are correct that abandonment is one means by which an individual or entity can relinquish rights to a mark in which it once had a property interest. *See* 15 U.S.C. § 1064(c). However, to establish abandonment it is imperative that the Defendants show both an intent to abandon as well as the loss of all indication as to the source of the mark's origin. *See Sweetheart Plastics, Inc. v. Detroit Forming, Inc.,* 743 F.2d 1039 (4th Cir.1984); *Conagra, Inc. v. Singleton,* 743 F.2d 1508 (11th Cir.1984); *Skippy, Inc. v. CPC Int'l, Inc.,* 674 F.2d 209 (4th Cir.), *cert. denied,* 459 U.S. 969, 103 S.Ct. 298, 74 L.Ed.2d 280 (1982). Evaluating Defendants' assertions and proof in light of this standard, the court finds that abandonment has not been established.

The court recognizes that many manufacturers used UNC–CH's marks prior to the licensing program's institution and is also dubious of UNC–CH's contention that it had no actual knowledge of any alleged unauthorized third-party use of its marks. However, as *Sweetheart* points out,

'[I]t appears that the only relevancy of failure to prosecute others is as to the possible impact such failure may have on the strength of the plaintiff's mark. It is possible that plaintiff's mark has been "weakened" by widespread use in the market and that such use resulted from plaintiff's failure to sue infringers.... Of course, if, through failure to prosecute, a mark continually loses "strength" and "distinctiveness", it will eventually hemorrhage so much that it dies as a mark. That would be "abandonment" through acts of omission ...

In the typical trademark litigation, the relevance of failure to prosecute others is not to "abandonment", but to "strength". The issue is hardly ever "abandonment", because *that requires proof that the mark has lost all significance as an indication of origin.* That is, the mark is completely without signs of life.'

*Sweetheart,* 743 F.2d 1047–48 (quoting 1 J. McCarthy, *Trademarks and Unfair Competition* § 17:5 at 779–80 [2d ed. 1984]) (emphasis added).

■ Defendants' contention that UNC–CH's marks have lost significance as indication of origin because the public can no longer point to a single source of the origin of *goods* bearing the marks does not establish abandonment, for under *Sweetheart* abandonment occurs only when a mark loses all significance as an indication of origin *as to the mark itself. See also Wallpaper Manufacturers, Ltd. v. Crown Wallcovering Corp.,* 680 F.2d 755, 763 (C.C.P.A.1982) ("view that there is no trademark 'when a mark loses its capacity to point out uniquely the single source of origin of goods' that is, unless one maintains *exclusivity* of rights, is ... simply 'bad law' "); *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976) (legislative history of Lanham Act clearly indicates that abandonment was principally intended to encompass acts of omission or commission by a registrant which result in a mark becoming generic).[1]

Here, it is clear that UNC–CH's marks would still be regarded by the public as having originated with the University. It is also relevant that the University has never discontinued its use of the marks, for continuous use indicates a lack of intent to abandon. *See Conagra, Inc. v. Singleton,* 743 F.2d 1508, 1516 (11th Cir.1985). Therefore, the court finds that neither UNC's failure to prosecute alleged infringers nor its allowance of uncontrolled use of its marks prior to 1982 establishes that UNC–CH abandoned its marks. Accordingly,

---

1. A term becomes generic when it describes the character of something and typically answers the question "what is it?", *i.e.,* it is a shirt; it is a car.

UNC–CH has valid trademarks in its name, initials, seal, and Tarheel foot.

## 2. Likelihood of confusion

While Defendants have failed to show that Plaintiffs do not have a valid property right in their marks, this does not settle the infringement issue, for it is now Plaintiffs' burden to show that Johnny T–Shirt's use of UNC's marks constitutes a "likelihood of confusion." While cases have indicated at one extreme that an alleged infringer's use of a mark with the knowledge that the public will be aware of the mark's origin is enough to establish likelihood of confusion, *see Boston Professional Hockey Ass'n v. Dallas Cap and Emblem Mfg., Inc.,* 510 F.2d 1004, 1012 (5th Cir.), *cert. denied,* 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975), and at the other that likelihood of confusion occurs only where there would be confusion as to the origin of the goods themselves, *see Conagra,* 743 F.2d at 1512, the majority of courts have taken the middle ground on this issue. This middle position, which both parties recognize in this case, is that the requisite likelihood of confusion will exist where there is likelihood of confusion as to source, sponsorship or endorsement of the goods. *See Warner Bros., Inc. v. Gay Toys, Inc.,* 724 F.2d 327, 329 (2d Cir.1983); *WSM, Inc. v. Tennessee Sales Co.,* 709 F.2d 1084, 1086 (6th Cir. 1983); *Supreme Assembly, Order of Rainbow for Girls v. J.H. Ray Jewelry Co.,* 676 F.2d 1079, 1082 (5th Cir.1982); *International Order of Job's Daughters v. Lindeburg & Co.,* 633 F.2d 912, 918–19 (9th Cir. 1980), *cert. denied,* 452 U.S. 941, 101 S.Ct. 3086, 69 L.Ed.2d 956 (1981); *Dallas Cowboys Cheerleaders v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 204–05 (2d Cir.1979).

Plaintiffs' primary contention on likelihood of confusion is that since the marks used by Johnny T–Shirt are not only similar but are identical to UNC–CH's registered marks there is no dispute as to likelihood of confusion. It is true that in the typical trademark case identity of marks establishes an open-and-shut case of infringement. *See* 2 J. McCarthy at 56. However, this is not the typical trademark case for, as the Third Circuit pointed out with regard to a similar dispute in *University of Pittsburgh v. Champion Products, Inc.,* 686 F.2d 1040, 1047 (3d Cir.), *cert. denied,* 459 U.S. 1087, 103 S.Ct. 571, 74 L.Ed.2d 933 (1982), "in this case there is no consumer confusion in the traditional sense. No one would seriously assert that a significant segment of the public believes that Pitt actually manufactured the goods involved." Instead, this case involves what Professor McCarthy refers to as "non-competitive goods," *i.e.,* a situation where the supposed infringer puts a mark on an item which is too remote from any item that the owner would be likely to make or sell.[2] In such a case it is not enough that the marks used be identical to those registered; instead, "[i]t is a question of fact as to whether consumers view such indicia … as symbols that identify a secondary source of sponsorship." 2 J. McCarthy, § 24:3 at 170; *see also In re Paramount Pictures Corp.,* 213 U.S.P.Q. 1111, 1112 (TTAB 1982).

While both parties cite cases in support of their respective contentions that there is and is not a likelihood of confusion as to sponsorship or endorsement regarding the tee-shirts and other paraphernalia offered by Johnny T–Shirt, this court, as did the court in *University of Pittsburgh,* finds the record insufficient to support a granting of summary judgment for either party. UNC–CH asserts that the case of *University of Georgia Athletic Ass'n v. Laite,* 756 F.2d 1535 (11th Cir.1985), supports its position that infringement has occurred because the court found likelihood of confusion based upon similarity of marks and the alleged infringer's intent to capitalize on the popularity of the University of Georgia football program.[3] However,

---

**2.** The court recognizes that UNC–CH, primarily through its bookstore, does sell items bearing its trademarks. However, this is not the primary business of the University.

**3.** In *Laite,* the University of Georgia Athletic Association sued the brewer of "Battlin' Bulldog Beer" for trademark infringement based on the use of a mark similar to the University of Georgia's bulldog to promote the beer.

as discussed above, the court agrees with Professor McCarthy that similarity or even identity of marks is not sufficient to establish confusion where non-competitive goods are involved, and the court also rejects the position that intent to capitalize on popularity is sufficient to establish infringement. *See American Footwear Corp. v. General Footwear Co., Ltd.,* 609 F.2d 655, 662 (2d Cir.1979), *cert. denied,* 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980) ("[O]ne can capitalize on a market or fad created by another provided that it is not accomplished by confusing the public into mistakenly purchasing the product in the belief that the product is the product of the competitor.").

The court believes that the view expressed in Judge Fletcher's opinion in *International Order of Job's Daughters v. Lindeburg & Co.,* 633 F.2d 912 (9th Cir. 1980), *cert. denied,* 452 U.S. 941, 101 S.Ct. 3086, 69 L.Ed.2d 956 (1981), is appropriate in this case:

> Our jewelry, clothing, and cars are emblazoned with inscriptions showing the organizations we belong to, the schools we attend, the landmarks we have visited, the sports teams we support, the beverages we imbibe. Although these inscriptions frequently include names and emblems that are also used as collective marks or trademarks, it would be naive to conclude that the name or emblem is desired because consumers believe that the product somehow originated with or was sponsored by the organization the name or emblem signifies.

*Id.* at 918. In essence, the court is skeptical that those individuals who purchase unlicensed tee-shirts bearing UNC–CH's marks care one way or the other whether the University sponsors or endorses such products or whether the products are officially licensed. Instead, as Defendants contend, it is equally likely that individuals buy the shirts to show their support for the University. *See Supreme Assembly, Order of Rainbow for Girls v. J.H. Ray Jewelry Co.,* 676 F.2d 1079, 1084 (5th Cir.1982) ("the fact that purchasers purchased Rainbow jewelry as a direct result of the presence of the Rainbow emblem does not compel the conclusion that they did so believing that the jewelry was in any way endorsed, sponsored, approved, or otherwise associated with Rainbow").

Given that there is a distinct possibility that individuals who buy products from Johnny T–Shirt do not base their decision upon whether the product is sponsored or endorsed by UNC–CH and that Plaintiffs bear the burden of establishing likelihood of confusion, the court holds that UNC–CH must meet its burden by showing more than simply the identity of the marks. Instead, it must provide evidence establishing that individuals do make the critical distinction as to sponsorship or endorsement, or direct evidence of actual confusion. *See* 2 J. McCarthy, § 24:3 at 172.

Here, as UNC–CH has relied heavily on the fact that the marks in question are identical, and the court has already noted that this is insufficient to establish likelihood of confusion under the circumstances, UNC–CH's lack of any evidence as to whether there is actual confusion generated by Johnny T–Shirt's goods precludes a grant of summary judgment in Plaintiffs' favor. However, the court cannot conclude as a matter of law that there would be no likelihood of confusion as to Johnny T–Shirt's goods. *See, e.g., National Football League Properties, Inc. v. Wichita Falls Sportswear, Inc.,* 532 F.Supp. 651 (W.D. Wash.1982) (where plaintiff presented well-designed and well-executed survey indicating that over 40% of those interviewed believed alleged infringer's products needed to be licensed, likelihood of confusion was established). Therefore, summary judgment will be denied on both the Plaintiffs' and Defendants' motions.

The court also notes that the *Laite* court's analysis relied heavily upon the former Fifth Circuit's decision in *Boston Professional Hockey Ass'n v. Dallas Cap & Emblem Mfg., Inc.,* 510 F.2d 1004 (5th Cir.), *cert. denied,* 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975). The broad language of *Boston Hockey* has been narrowed in subsequent Fifth Circuit decisions. *See, e.g., Supreme Assembly, Order of Rainbow for Girls v. J.H. Ray Jewelry Co.,* 676 F.2d 1079 (5th Cir. 1982).

### B. *Defendants' Counterclaims*

#### 1. Violation of N.C.Gen.Stat. § 75–1.1

 In their counterclaim to Plaintiffs' complaint, Defendants assert that UNC–CH's efforts to prohibit Defendants' use of the University's insignia constitute restraint of trade in violation of N.C.Gen. Stat. § 75–1.1. In response, the University contends that it is not subject to suit under Section 75–1.1 because of the doctrine of sovereign immunity. In the alternative, Plaintiffs contend that even if sovereign immunity were waived as to Section 75–1.1 the statute would still not apply because UNC–CH is not a corporation within the meaning of the statute. Because the court finds that sovereign immunity protects the University from suit under Section 75–1.1, the University's alternative argument will not be considered.

In the present case, Defendants have asserted a state claim against a state agency and its governing body in federal court. In such a situation, the Eleventh Amendment to the United States Constitution bars an award of either monetary or injunctive relief against the state. *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 104–06, 104 S.Ct. 900, 910–11, 79 L.Ed. 2d 67 (1984). While a state may waive this immunity, such waiver will be found "only where stated 'by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction.'" *Edelman v. Jordan,* 415 U.S. 651, 673, 94 S.Ct. 1347, 1360, 39 L.Ed.2d 662 (1974) (quoting *Murray v. Wilson Distilling Co.,* 213 U.S. 151, 171, 29 S.Ct. 458, 464, 53 L.Ed. 742 [1909]).

This district has held that the University of North Carolina at Chapel Hill is an "alter ego" of the State of North Carolina. *See Roberson v. Dale,* 464 F.Supp. 680, 687 (M.D.N.C.1979). Thus, Plaintiffs contend, UNC–CH is entitled to all the sovereign immunity that the State of North Carolina enjoys and that since such immunity has not been waived the University is protected against Defendants' counterclaim under Section 75–1.1.

Defendants do not appear to contest that the University enjoys the same degree of sovereign immunity as the State on the basis of the "alter ego" status. However, Defendants contend that the University has waived its immunity through N.C.Gen.Stat. § 116–3, which provides that the University is "able and capable in law to sue and be sued in all courts whatsoever." In support of their contention that Section 116–3 waives immunity, Defendants cite *Soni v. Board of Trustees of the University of Tennessee,* 513 F.2d 347 (6th Cir.1975), *cert. denied,* 426 U.S. 919, 96 S.Ct. 2623, 49 L.Ed.2d 372 (1976), in which the Sixth Circuit interpreted the language that the University of Tennessee could "sue and be sued, plead and be impleaded, in any court of law or equity in this State or elsewhere" as a waiver of eleventh amendment immunity. *Id.* at 353. Defendants also note that in *Roberson* the court, without deciding the issue, commented that the State's enactment of Section 116–3 "suggests" that it has waived its eleventh amendment immunity. *Roberson,* 464 F.Supp. at 687 n. 15.

However, both the Fourth Circuit and the North Carolina Court of Appeals have determined that Section 116–3 allows UNC–CH to be sued only to the extent that the State can be sued and does not operate to abolish the doctrine of sovereign immunity with regard to the University. *See Mayberry v. Dees,* 638 F.2d 690, *reh'g granted and rev'd on other grounds,* 663 F.2d 502 (4th Cir.1981), *cert. denied,* 459 U.S. 830, 103 S.Ct. 69, 74 L.Ed.2d 69 (1982);[4] *Truesdale v. University of North Carolina,* 91 N.C.App. 186, 192, 371 S.E.2d 503, 506–07 (1988). The court also notes that the *Roberson* footnote to which Defendants refer states that Section 116–3 would appear to waive immunity "in [the] type of

---

**4.** As the Fourth Circuit's first opinion in *Mayberry* was withdrawn when rehearing was granted, the case does not appear in the Federal Reporter and is available only through the advance sheets. However, in the court's opinion upon rehearing, the court noted that it affirmed its decision as to the sovereign immunity issue. *See Mayberry v. Dees,* 663 F.2d 502, 504 (4th Cir.1981), *cert. denied,* 459 U.S. 830, 103 S.Ct. 69, 74 L.Ed.2d 69 (1982).

case" presented by *Roberson,* which involved a breach of employment contract. This observation was made not only on the basis of the language of Section 116–3 but also upon the North Carolina Supreme Court's opinion in *Smith v. State,* 289 N.C. 303, 222 S.E.2d 412 (1976), in which the court held that once the State enters into a valid contract it consents to be sued for damages in the event that it breaches the contract. Therefore, based on the interpretations of Section 116–3 by both the Fourth Circuit and the Court of Appeals of North Carolina and the fact that the *Roberson* footnote does not support a waiver of sovereign immunity under all circumstances, this court finds that sovereign immunity protects UNC–CH from suit under Section 75–1.1. Consequently, Plaintiffs' motion for summary judgment on this issue will be granted.

2. Defendants' claim under N.C.Gen. Stat. § 66–58

■ North Carolina's Umstead Act, N.C. Gen.Stat. § 66–58, prohibits state units, departments, or agencies as well as their subdivisions and employees from engaging "directly or indirectly, in the sale of goods, wares, or merchandise in competition with citizens of the State." According to Defendants, Plaintiffs' trademark licensing program violates this statute because through the program UNC–CH is engaging at least indirectly in the sale of goods. The University, however, contends that this statute is inapplicable to it for several reasons, including the University's exemption from the Act under subsection (b)(8), the trademark licensing program's purpose of protecting the property of the State rather than competing with state citizens, and the fact that the statute provides that any violation of its terms is a misdemeanor, thus barring any private cause of action under the statute. Because the court agrees with the University that no private cause of action exists under the Umstead Act, the University's alternative arguments will not be considered.

With regard to private causes of action arising from criminal statutes, the North Carolina Supreme Court has stated that where a statute creates liability where none existed before and denominates its violation as a misdemeanor and prescribes remedies for enforcement, such remedies are exclusive. *Moose v. Barrett,* 223 N.C. 524, 527, 27 S.E.2d 532, 534 (1943). In addition, the Fourth Circuit has also noted that once a criminal statute provides a remedy, "implied causes of action are disfavored and should be found only where a statute clearly indicates that the plaintiff is one of a class for whose benefit the statute was enacted and there is some indication that [the legislature] intended such a cause of action to lie." *Flowers v. Tandy Corp.,* 773 F.2d 585, 589 (4th Cir.1985).

Subsection (e) of the Umstead Act, denominating its violation a misdemeanor, provides an exclusive remedy as contemplated by *Moose* and there is no clear indication that the statute was intended to protect any special class of which Defendants might be members. Given these factors plus the fact that the North Carolina courts have not addressed whether the statute provides a private cause of action, this court declines to find that the statute creates such a private cause of action. Thus, Defendants' motion for summary judgment under Section 66–58 will be denied and Plaintiffs' motion for summary judgment on Defendants' claim under this provision will be granted.

3. Defendants' claim under the Sherman Act

■ In their counterclaim, Defendants assert that since Plaintiffs' "acts and activities directly restrain trade in both intrastate and interstate commerce," the University is acting in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. In response, Plaintiffs contend that they are immune from suit under the Sherman Act because in instituting the trademark licensing program they acted as sovereign representatives. In the alternative, Plaintiffs assert that even if they are not sovereign representatives of the State of North Carolina who acted as the sovereign in implementing the trademark licensing program, they remain entitled to immunity because

they are not part of the plurality of actors required to impose liability under the Sherman Act and also because they acted in accordance with a state policy to displace competition with regulation or a public service monopoly. *See Town of Hallie v. City of Eau Claire,* 471 U.S. 34, 39, 105 S.Ct. 1713, 1716, 85 L.Ed.2d 24 (1985) (such activity exempt from suit under Sherman Act). Because the court finds that Plaintiffs are sovereign representatives who were acting as the sovereign in instituting the trademark licensing program, they are immune from suit under the Sherman Act and hence entitled to summary judgment on Defendants' claim.

Under *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), when a state through a sovereign representative acts as sovereign, the state representative is immune from suit under the Sherman Act. For purposes of this immunity, the state representative may be the legislative, executive, or judicial branch. *See Hoover v. Ronwin,* 466 U.S. 558, 104 S.Ct. 1989, 80 L.Ed.2d 590 (1984) (immunity extends to legislative or judicial branches); *Deak–Perera Hawaii, Inc. v. Department of Transp.,* 745 F.2d 1281 (9th Cir.1984), *cert. denied,* 470 U.S. 1053, 105 S.Ct. 1756, 84 L.Ed.2d 820 (1985) (immunity applies to executive branch).

While few cases have considered whether universities and their governing boards are immune from suit under the Sherman Act, decisions indicate that such immunity exists. A case particularly relevant is *Reid v. University of Minnesota,* 107 F.Supp. 439 (N.D.Ohio 1952), in which a wholesaler of books brought suit against the University of Minnesota Press under the Sherman Act for alleged price discrimination. Finding the university press immune from such suit, the court noted:

> The 'Regents of the University of Minnesota' is a constitutional corporation created to carry out State purposes and the acts of the Regents are, therefore, the acts of the State of Minnesota. The University of Minnesota Press, being a creature of the Regents ..., is, therefore, an agency of the State of Minnesota

and the acts of the Press are the acts of the State of Minnesota.

*Id.* at 442.

Likewise, in *Saenz v. University Interscholastic League,* 487 F.2d 1026 (5th Cir. 1973), the court held that defendant was immune from suit under the Sherman Act for allegedly designing a slide rule contest to exclude plaintiff's design and benefit a competitor. The court based its decision on the fact that defendant was part of the extension division of the University of Texas, that its administrative authority was appointed by the president of the university, and that it received funding and space from the university, which was "inarguably" a state agency. *Id.* at 1028.

In the present case the University of North Carolina and its governing board are, respectively, a constitutional agency and body created to "carry out State purposes." Thus, the University and its Board are sovereign representatives of the State of North Carolina. Further, as protection of the name and symbols of the State is an inherent power of states, *Halter v. Nebraska,* 205 U.S. 34, 27 S.Ct. 419, 51 L.Ed. 696 (1907), UNC–CH and its governing board were acting as sovereigns in instituting the trademark licensing program. Thus, Plaintiffs are immune from suit for violation of the Sherman Act in this instance, and their motion for summary judgment on Defendants' claim shall be granted.

4. Defendants' claim under the first amendment

 Finally, Defendants claim that their use of the names and symbols of the University is a constitutionally protected form of noncommercial speech under the first amendment. Thus, they claim that the actions of the University must be subject to first amendment scrutiny.

However, the case cited by Defendants in support of their contention, *Lucasfilm Ltd. v. High Frontier,* 622 F.Supp. 931 (D.D.C. 1985), does not support the position that Plaintiffs' trademarks infringe on Defendants' first amendment rights. In *Lucasfilm,* owners of the trademark "Star Wars" brought suit under the Lanham Act

against interest groups that used the term in their advertisements concerning the Strategic Defense Initiative. The court found that trademark rights did not entitle the holders thereof to quash the public interest groups' use of the terms, for "the defendants have not affixed any trademark to any goods or services. Indeed, they are not engaged in selling anything but ideas." *Id.* at 934. However, the court did note that the trademark would protect against infringement by

> those who seek to attach those words to products or services that compete ... in the marketplace, against those who dilute the value of [the] mark by engaging in a noncompeting trade or business but utilize the mark in connection with a disreputable or sleazy product or service, and, under some circumstances, even against those who injure [the business of the trademark holder] by offering goods or services that disparage the goodwill value of [the mark].

*Id.* at 933.

Here, while Defendants claim that those who wear tee-shirts with the University's names and symbols on them are communicating their allegiance with the University, the Defendants themselves have made no claim that by placing such trademarks and logos on shirts they are doing anything but engaging in commercial activity. Such activity clearly falls within the prohibitions of the Lanham Act. *See L.L. Bean, Inc. v. Drake Publishers, Inc.,* 811 F.2d 26, 29 (1st Cir.1987) (sweep of trademark owner's rights extends to injurious unauthorized commercial uses of mark by another). Thus, the court finds that in this instance Defendants' first amendment rights are not infringed upon by Plaintiffs' trademarks; consequently, summary judgment will be granted for Plaintiffs on Defendants' first amendment claim.[5]

An order and judgment in accordance with this memorandum opinion shall be entered contemporaneously herewith.

### ORDER and JUDGMENT

BULLOCK, District Judge.

For the reasons expressed in the memorandum opinion filed contemporaneously herewith,

IT IS HEREBY ORDERED that Plaintiffs' motion for summary judgment on their claim of trademark infringement is DENIED;

IT IS FURTHER ORDERED that Defendants' motion for summary judgment on Plaintiffs' claim of trademark infringement is hereby DENIED;

IT IS FURTHER ORDERED that Defendants' motion for summary judgment on their claim under N.C.Gen.Stat. § 66–58 is DENIED; and

IT IS HEREBY ORDERED AND ADJUDGED that Plaintiffs' motion for summary judgment on Defendants' counterclaims under N.C.Gen.Stat. § 66–58, N.C. Gen.Stat. § 75–1.1, 15 U.S.C. § 1 *et seq.*, and the First and Fourteenth Amendments to the United States Constitution is hereby GRANTED, and such claims are DISMISSED WITH PREJUDICE.

---

**5.** The court notes that in support of its motion Plaintiffs cited *San Francisco Arts and Athletics, Inc. v. United States Olympic Committee,* 483 U.S. 522, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987), in which the Supreme Court held that the Olympic Committee's exclusive right to use the word "Olympic" did not infringe upon the first amendment rights of San Francisco Arts and Athletics, which wished to label an athletic competition as the "Gay Olympic Games." The court is hesitant to apply the analysis of *San Francisco Arts* to the case before it, for Congress has specifically granted to the Olympic Committee rights in the word "Olympic" which go beyond the protections afforded by the Lanham Act. However, regardless of whether the analysis of *San Francisco Arts* would apply to a Lanham Act case, the court finds that Defendants have not established that their activity involves the communication of ideas or points of view as opposed to a mere commercial endeavor.