**B. Patricia DYSON et al., Plaintiffs,**

v.

**William E. LAVERY et al., Defendants.**

**Civ. A. No. 73–584–R.**

United States District Court,
E. D. Virginia,
Richmond Division.

June 11, 1976.

Philip J. Hirschkop, John D. Grad, Alexandria, Va., for plaintiffs.

Walter H. Ryland, Asst. Atty. Gen., D. Patrick Lacy, Jr., William H. Hefty, Richmond, Va., for defendants.

## MEMORANDUM

MERHIGE, District Judge.

Plaintiff, B. Patricia Dyson, brings this action on her behalf and on behalf of those similarly situated for declaratory, injunctive and monetary relief to redress alleged

discriminatory employment practices on the basis of sex in violation of §§ 1983 and 1985, Title 42 of the United States Code and the First and Fourteenth Amendments of the United States Constitution.[1] Defendant T. Marshall Hahn, Jr. was a former President of Virginia Polytechnic Institute and State University (hereinafter "VPI") in Blacksburg, Virginia, and is sued in his individual capacity.[2] Defendant William E. Lavery, President of VPI, is sued in his official capacity, and defendant Eugene Row, a member of the VPI Board of Visitors, is sued in his official and individual capacities.[3] B. Patricia Dyson, is a citizen of the United States and a resident of the Commonwealth of Virginia. She was an instructor of Business Education at VPI from September 1971 to September 1973. Jurisdiction is attained pursuant to 28 U.S.C. §§ 1331 and 1343.[4]

In February 1970, plaintiff Dyson applied for a position on the Business Law faculty in the Department of Business Administration at VPI. At the time of her application, she possessed a Juris Doctor degree and was a member of the Maryland State Bar Association. She was initially rejected. In May 1971, Ms. Dyson again applied, and was offered a position as an instructor on the Business Law faculty at a salary of $8,400 per year. A letter of her appointment noted that "[w]hile this offer is made for the 1971–72 academic year only, I will be pleased to discuss with you the possibility of renewal later next year when we can review your teaching progress and the Department's future staffing needs." Observations on her work situation led her to file a complaint of sex discrimination with the Department of Health, Education and Welfare (hereinafter "HEW"); VPI was noti-

fied of the claim in early December 1971. A letter dated April 14, 1972 was subsequently delivered to the plaintiff from Dr. King, the head of the Business Department, indicating that she would not be rehired for the succeeding academic year. Ms. Dyson successfully argued that the notice was untimely under the appropriate regulations promulgated by the American Association of University Professors (AAUP). She was reinstated for one academic year, on May 1, 1972, and was served with a notice of renewal for the succeeding year in November of 1972. She contends that she was hired in a position below her capabilities and qualifications, and that she was arbitrarily discharged because of her sex. Accordingly, it is alleged that the defendants' conduct has deprived the plaintiff of the equal protection of the laws as well as the due process of law in contravention of the Fourteenth Amendment of the United States Constitution.

By order of May 6, 1974, the Court declared a tentative class action pursuant to Fed.R.Civ.P., Rule 23(b)(2) and (b)(3) for appropriate discovery. At that time several universities were involved in the suit, and the Court concluded that several members of the defendant class, without evidence of a central policy of discrimination that would link them together, would be submitted to both expensive and extensive discovery even though they had no contact with the named plaintiffs. Accordingly, the class was only tentatively defined and discovery limitations were imposed on the plaintiffs. However, by virtue of appropriate orders heretofore entered in the case the instant matter involves only the allegations against VPI. The proposed class of the controversy presently before the Court

---

1. The plaintiffs' initial claims based on a violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. have been voluntarily withdrawn.

2. Defendant Hahn was initially sued in both his individual capacity and his official capacity as President of VPI. During the pendency of the suit he was replaced in that capacity by Mr. Lavery. At trial the Court, pursuant to Federal Rules of Civil Procedure, rule 25(d)(1), permit-

ted Mr. Lavery to be substituted as a party defendant in his official capacity.

3. Mr. Row has not been properly served, however, and has not made an appearance before the Court. Accordingly, all claims against him must be dismissed.

4. It is alleged that the amount in controversy, exclusive of interest and costs, exceeds the sum of $10,000.

involves only those females subject to the control of the University administration at VPI. Proof of unequal treatment by that institution of representative members of the class, *i. e.,* the named plaintiffs, based on sexual discrimination would raise an inference that similar objective or statistical inequality between males and females on a university-wide scale is motivated by similar discrimination. The proposed class no longer appears to be overbroad. As was noted in the March 6, 1974 order, all other Rule 23, Federal Rules of Civil Procedure, requirements for a class action are met; the Court therefore, concludes that the suit is appropriate for a class action certification and so certifies it.

 The law is clear that classification and diverse treatment based on sex are subject to scrutiny under the principles of the Equal Protection Clause.[5] *E. g., Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971). The appropriate test to be utilized in this Circuit was defined in *Eslinger v. Thomas,* 476 F.2d 225, 230–31 (4th Cir. 1973):

> "Thus, *Reed,* in a case of invidious sex discrimination, prescribed as a test of validity the presence of a 'fair and substantial' relation between the basis of the classification and the object of the classification. A classification based on sex is less than suspect; a validating relationship must be more than minimal. What emerges is an 'intermediate approach' between rational basis and compelling interest as a test of validity under the Equal Protection Clause." (footnotes omitted)

Defendants do not seek to offer a justification for any sexual discrimination that may exist at VPI among the faculty positions, but rather they contend sexual discrimination, in fact, is nonexistent. Moreover, the Court notes that the record adduced in the instant case reveals no characteristics of VPI or of the jobs in issue at VPI that would support a contention that sex discrimination is necessary to further the purposes, goals, and aims of that institution. Accordingly, if the alleged acts of sex discrimination were found to exist at that institution, the Court would have to conclude that VPI had acted to violate the principles of the Equal Protection Clause, and appropriate relief would be warranted. Before enunciating the Court's finding on the substantive issue, it is both necessary and appropriate that several peripheral issues be resolved.

 Defendant Lavery, who has been sued in his official capacity only, contends that any recovery sought against him is barred by the Eleventh Amendment to the United States Constitution. The history of the amendment is a familiar and well-recited one. It was adopted in 1798 in order to overrule the decision of the United States Supreme Court in *Chisholm v. Georgia,* 2 U.S. (2 Dall.) 419, 1 L.Ed. 440 (1793). The Court there held that Article III of the Constitution, investing the federal courts with jurisdiction over suits between a state and citizens of another state, permits a federal court to hear a contract case brought by a citizen of North Carolina against the State of Georgia. The decision, not unlike many of more recent vintage, was immensely unpopular in that it caused an apprehension that federal courts would be used to compel the payment of debts and other claims against the states that would interfere with their fiscal autonomy, perhaps even to the point of undermining their financial stability, and sovereignty. *See* C. Haines, *The Role of Supreme Court in American Government and Politics 1789–1835,* at 441 (1944); C. Jacobs, *Eleventh Amendment and Sovereign Immunity* at 69–74 (1972); C. Warren, *Supreme Court of United States History* at 99 (rev. ed. 1937). Unchanged since its passage, the amendment provides:

> "The judicial power of the United States shall not be construed to extend to any

**5.** The plaintiffs also alleged a violation of the Due Process Clause of the Fourteenth Amendment. Since those claims are also based on allegations of sexual discrimination, they are subsumed, even if valid, by the plaintiffs' claims of a violation of the Equal Protection Clause. Accordingly, the Court does not need to reach the issue.

suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state."

The amendment does not expressly bar suits against the state by its own citizens, but the Supreme Court has consistently, and without ambiguity, held that an unconsenting state is immune from suits brought in federal courts by her own citizens as well as by citizens of a foreign state. *E. g., Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Employees v. Department of Public Health and Welfare,* 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973); *Duhne v. New Jersey,* 251 U.S. 311, 40 S.Ct. 154, 64 L.Ed. 280 (1920); *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890).

The Court, sensitive to the demands of establishing and maintaining the supremacy of federal law, subsequently fashioned an exception to the amendment based on a theory originating in ancient English practice, *see* Jaffe, *Suits Against Governments and Officers: Sovereign Immunity,* 77 Harv.L.Rev. 1, 9–16 (1963), that government officials might be sued as individuals. In *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) the Court held that state officials might be enjoined as individuals from enforcing an unconstitutional state law. In a recent Eleventh Amendment case, however, the Supreme Court explicitly limited the types of relief that might be granted under the *Ex parte Young* rationale. In *Edelman v. Jordan, supra,* a majority of the Court held that the Eleventh Amendment prohibits federal courts from ordering state officials to release welfare benefits withheld contrary to a federal regulation. The Court there refused to extend the principles of *Ex parte Young* to cases in which the requested relief, although styled as "equitable" by the plaintiff, in fact involves a judgment payable out of the state treasury. Although acknowledging that orders entered in *Ex parte Young* and its progeny also have had a substantial impact on state budgets, the Court found the retroactivity of the district court's award in *Edelman* decisive. If the

Eleventh Amendment applies to protect Mr. Lavery in the instant action, any claim of equitable damages against him for past discriminatory acts must be denied. However, plaintiff's claims for future injunctive relief from Mr. Lavery, being proscriptive in nature, would continue to survive. *See Assaf v. University of Texas School System,* 399 F.Supp. 1245 (S.D.Tex.1975); *Stebbins v. Weaver,* 396 F.Supp. 104 (W.D.Wis.1975).

Even though Mr. Lavery in his official capacity and not the state is the named defendant in the action, the Supreme Court has held that the Eleventh Amendment may apply to bar the suit.

> "[W]hen the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants."

*Ford Motor Co. v. Department of Treasury,* 323 U.S. 459, 464, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1945), *quoted in Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1973).

In *Edelman,* however, the Court noted that subdivisions of state governments may not be shielded by the Eleventh Amendment.

> "The fact that the county policies executed by the county officials in Griffin [*Griffin v. School Board,* 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964)] were subject to the commands of the Fourteenth Amendment, but the county was not able to invoke the protection of the Eleventh Amendment, is no more than a recognition of the long-established rule that while county action is generally state action for purposes of the Fourteenth Amendment, a county defendant is not necessarily a state defendant for purposes of the Eleventh Amendment."

415 U.S. at 667, n. 12, 94 S.Ct. at 1358. In determining whether a particular agency or subdivision is an independent government instrumentality or is the "alter ego" of the state so as to warrant the cloak of protec-

tion afforded by the Eleventh Amendment, the Court must look at whether the funds claimed will, if awarded, directly deplete the state treasury. *Edelman v. Jordan, supra* at 663, 94 S.Ct. 1347; *Kennecott Copper Corp. v. State Tax Comm.,* 327 U.S. 573, 66 S.Ct. 745, 90 L.Ed. 862 (1946); *Great Northern Life Insurance Co. v. Read,* 322 U.S. 47, 64 S.Ct. 873, 88 L.Ed. 1121 (1944). The award must come out of funds appropriated by the state legislative process, or if the award cannot be satisfied without further appropriations by, or without the assent of, officials in the state legislative process, it must be denied. The degree to which the state organization sued is financially dependent upon the state determines, then, the state's ultimate liability for any judgment that may be levied on the organization. Accordingly, the powers and legal form, as defined by the applicable state law, of the entity in question are crucial to the determination of the Eleventh Amendment's application. *See generally Hutchison v. Lake Oswego School District No. 7,* 519 F.2d 961 (9th Cir. 1975); *Fitzpatrick v. Bitzer,* 519 F.2d 559 (2d Cir.), *cert. granted,* 423 U.S. 1031, 96 S.Ct. 561, 46 L.Ed.2d 404 (1975); *Soni v. Board of Trustees of University of Tennessee,* 513 F.2d 347 (6th Cir. 1975); *Skehan v. Board of Trustees,* 501 F.2d 31 (3d Cir. 1974), *vacated,* 421 U.S. 983, 95 S.Ct. 1986, 44 L.Ed.2d 474 (1975); *George R. Whitten Jr., Inc. v. State University Construction Fund,* 493 F.2d 177 (1st Cir. 1974).

VPI was created by the General Assembly of Virginia pursuant to its authority from the State Corporation Commission as a corporate body managed by a Board of Visitors and "at all times be under the control of the General Assembly." Va.Code § 23–114 (1973 Repl.Vol.). The Board of Visitors consists of 15 members, 13 of whom are appointed by the Governor of Virginia, and two of whom are the incumbent President of the Virginia State Board of Agriculture and Immigration, and the Virginia State Superintendent of Public Instruction, both ex officio. Va.Code § 23–115 (1973 Repl.Vol.). The Board appoints a president of the University, Va.Code § 23–126 (1973 Repl.Vol.), appoints and removes professors, Va.Code § 23–124 (1973 Repl.Vol.), fixes professors salaries and the fees to be charged students for tuition, Va.Code § 23–128 (1973 Repl.Vol.), prescribes the duties of each professor and his/her course duties and mode of instruction, Va.Code § 23–125 (1973 Repl.Vol.), and is generally charged with the care and preservation of the property belonging to the University. Va.Code § 23–122 (1973 Repl.Vol.). The University is also authorized to hold real and personal property in its own name. Va.Code § 23–166 (1973 Repl.Vol.) It may issue bonds in its own name with the consent of the government, and any such bonds are not considered to be a debt or obligation of the state. Va.Code § 23–14 *et seq.* (1973 Repl. Vol.). Furthermore, the General Assembly has expressly authorized suits against the University in its own name on any bond obligations, and on any contractual or quasi-contractual agreements entered into in connection with University bond or other debt financing activities. Va.Code § 23–16 (1973 Repl.Vol.) The Virginia Code also provides that "every [educational] institution shall be required to pay no taxes or assessments of any kind whatsoever upon any project acquired, erected or leased and operated and maintained by it . . . " Va.Code § 23–25. (1973 Repl.Vol.)

■ In conclusion, the University is given a considerable degree of autonomy from its creating bodies. There exist two major links to the state governing structure, however, that allow that structure to retain a degree of control over the day to day affairs of VPI. First, the General Assembly by specific statute, and the Governor in exercising his delegated authority to approve specific University actions, may, in effect, substantively regulate University activities. *See, e. g.* Va.Code §§ 23–19, 23–142 (1975). Second, the General Assembly funds to a significant degree the University's programs, and by earmarking those funds may substantially affect the University's operation. *See* 2 Virginia Acts of Assembly ch. 681 § 158 at 1425–26 (1974). It must be noted, however, that the Univer-

sity has three major sources of revenue that do not come from the state treasury. First the University may issue bonds that are expressly not binding on the state; second, the University may accept individual and governmental donations, *e. g.,* Va.Code § 23–141 (1973 Repl.Vol.); and, third, the University may assess its students a fee for tuition. Also available, but not as large, are funds from users fees that are collected when individuals partake of University facilities and services. Only a general state supervisory function is exercised over these revenue gathering operations; it is clear that the University has a good deal of autonomy in utilizing these sources. Furthermore, it is equally clear that these sources do not directly deplete the state treasury. An award of damages for past discriminatory practices in violation of federal law would seem to have to come from either a state appropriation fund or the student tuition fees, or both, as the other sources of revenue are generally more rigidly earmarked for specific obligations. If the award were to come from student tuition, the state would be under no legal obligation to make good the loss. Accordingly, the Court concludes that there is a substantial fund available that is wholly separate from the state treasury and that may be used to pay any retrospective relief awarded in this case; the Eleventh Amendment, therefore, does not shield defendant Lavery in his official capacity from any of the claims for relief against him in the instant suit. *See Schiff v. Williams,* 519 F.2d 257 (5th Cir. 1975); *Scott v. University of Delaware,* 385 F.Supp. 937 (Del.1974); *Gordenstein v. University of Delaware,* 381 F.Supp. 718 (Del. 1974); *but see Brennan v. University of Kansas,* 451 F.2d 1287 (10th Cir. 1971).

Furthermore, Mr. Lavery may be sued in his official capacity on claims based on § 1983 violations. It has been established in this Circuit that public officials are "persons" within the meaning of this section. *E. g., Thomas v. Ward,* 529 F.2d 916 (4th Cir. November 24, 1975); *Burt v. Board of Trustees of Edgefield City School District,* 521 F.2d 1201 (4th Cir. 1975); *Harper v. Kloster,* 486 F.2d 1134, 1138 (4th Cir. 1973). *See also Griffin v. County School Board,* 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964); *Douglas v. City of Jeannette,* 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 (1943).

Finally, the defendants further contend that, with respect to the plaintiffs' claims for damages, that they are entitled to a qualified official immunity. *See Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). In *Wood* school officials were given absolution from damage relief if their actions were sincere and based upon a justifiable misunderstanding of the constitutional rights violated. *Id.* at 321–22, 95 S.Ct. 992. This qualified immunity does not extend to claims for equitable relief, however. *See id.* at 315, n. 6, 95 S.Ct. 992; *Burt v. Board of Trustees of Edgefield County School District,* 521 F.2d 1201, 1205–06 (4th Cir. 1975). Two types of equitable relief are prayed for by the named plaintiff in the instant action: first, restitution of illegally withheld back pay; and, second, injunctive relief in the form of reinstatement. *See generally Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). These claims, however, cannot apply to Mr. Hahn, the former President of the University, who is sued in his individual capacity. He no longer can effectuate a reinstatement of the named plaintiff, or afford other affirmative equitable relief for the class, nor is he the party or a representative of the party enriched by the allegedly withheld monies. *See Burt v. Board of Trustees of Edgefield County School District,* 521 F.2d at 1204. Accordingly, defendant Hahn may only be held liable for damages, a claim to which the qualified immunity applies.

Furthermore, some personal involvement by the defendant is required; the doctrine of respondeat superior does not apply in § 1983 proceedings. *E. g., Barrow v. Bounds,* 498 F.2d 1397 (4th Cir. July 1, 1974). *See also Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 600, 46 L.Ed.2d 561 (1976); *Jennings v. Davis,* 476 F.2d 1271 (8th Cir.

1973); *Adams v. Pate,* 445 F.2d 105 (7th Cir. 1971); *Madison v. Gerstein,* 440 F.2d 338 (5th Cir. 1971); *Dunham v. Crosby,* 435 F.2d 1177 (1st Cir. 1970). The facts in the instant case reflect that defendant Lavery had no personal involvement in the matter, having been appointed after the alleged discriminatory acts against plaintiff Dyson had taken place and late in the period covered by the class action claims. However, his predecessor in office, defendant Hahn, took an active role in corresponding with the Department of Health, Education and Welfare on the status of the sex discrimination claims directed at the University. He was obviously well aware of plaintiff Dyson's claims before she received her first termination notice, and became actively involved in University efforts in the denial of any wrongdoing. Furthermore, the evidence indicates that he investigated the basis of the sex discrimination charges, and advanced administrative directives aimed at diminishing their significance and effect. In effect, Hahn's actions, in affirmatively supporting the policies and actions of his administrators sustained and furthered any sex discrimination that may have been previously undertaken against plaintiff Dyson and other class members, and perpetuated any sex discrimination that may have been undertaken subsequent to his efforts. There is, however, no credible evidence before the Court to the effect that he undertook his efforts to defend University practices in bad faith; in fact, the evidence submitted indicated that he acted in reliance on reports and communications from his subordinates, the primary actors in this controversy. Accordingly, while defendant Hahn may not be personally liable for damages, he was liable for actions undertaken in his official capacity, and that liability has been assumed by Mr. Lavery in his official capacity, the subsequent holder of defendant Hahn's office. Fed.R.Civ.P., Rule 25(d)(1).[6]

█ Turning to the case against Mr. Lavery, the Court finds that plaintiff Dyson was purposefully discriminated against on the grounds of her sex at the time of her initial hiring. At the time of her first interview there were seventy-eight men on the College of Business faculty and two women. Both women held positions as Instructors; Ms. Dyson sought a position as an Assistant Professor. During her interview, which was exceedingly short in comparison with the interviews given other prospective faculty members, the dominant concern of the interview was whether she could handle a class of males; little or no discussion was pursued on her professional background or abilities. She was initially rejected, never having been seriously considered as a candidate for a permanent position. Her second interview was equally short and very late in the traditional interview period for positions for the succeeding academic year. She was apparently needed to fill out the Business Law program, and the fact that her husband worked at the University, and, therefore, that she was a local resident, made her a likely candidate for a stopgap position. Accordingly, she was offered a position as an instructor for the 1971–72 academic year at a salary of $8,400 per year.

She thus became the first lawyer hired by the Business Department as an instructor; all lawyers hired by the Department prior to Ms. Dyson were given the rank of Assistant Professor or above. The Assistant Professorship position for which she applied was vacated by a male with a Juris Doctor degree; the male who was hired into the position she sought held a Juris Doctor degree. The defendants' efforts to distinguish the male members of the Department that had or were given the rank of Assistant Professor on the basis of prior teaching experience and the like are unpersuasive. Ms. Dyson had prior experience in the business community, had published a minor work, and was attempting to publish a more substantial piece; comparable males in the Department at the Assistant Professor level had similar and basically indistinguishable records. The inequality of treatment received by Ms. Dyson from the be-

**6.** See footnote 2 *supra.*

ginning of the interviewing process to her actual hiring as compared with males of similar qualifications can only be explained by reference to her sex.

Although a usual instructorship appointment is for only one academic year, University policy is to renew the employment relationship for more than one year if an instructor's performance is adequate. A finding of sex discrimination at the time of hiring, however, lends a strong inference to the proposition that one of the significant factors that led to the University's refusal to extend to Ms. Dyson's contract was also her sex. Furthermore, the timing of the initial notice of nonreinstatement indicates Ms. Dyson may have been institutionally penalized for attempting to assert her grievance of sex discrimination with federal authorities. Finally, it must be noted that once the decision to terminate any future relationship with Ms. Dyson was made she was not treated courteously; she was given cramped office quarters and awkward class times, and was not invited to the usual faculty functions. Whether this treatment was sexually motivated depends, however, on whether the decision to terminate her was so motivated.

The defendants contend, however, that two factors, wholly unrelated to sex, prompted the decision to seek other faculty members for Department employment. First, it is contended that the head of the Business Department in the course of the following academic year, i. e. 1971–72, made concerted efforts to upgrade the Business Law Section faculty by hiring individuals with qualifications higher than those that had been previously required.[7] Two individuals were subsequently hired at the Assistant Professor level in the fall of 1972 that possessed, in addition to the Juris Doctor degree, other advanced degrees and/or extensive professional publications. These efforts were spawned by the rigidness of the standards adopted by the tenure ap-

proval committees. Tenure review is mandatory for permanent faculty members, and those that are not offered tenure are asked to leave. It makes little sense to hire faculty members in permanent positions if they have little likelihood of withstanding the tenure review process. The evidence indicates that it was the opinion of the Business Department administrators that Ms. Dyson would not be able to pass the tenure evaluation by reason of her lack of professional qualifications. Additionally, it is contended that the hiring of the two additional faculty members with excellent qualifications made Ms. Dyson's temporary position superfluous.

Second, the Business Department administrators testified that the input received through normal channels for Ms. Dyson's teaching performance had been generally negative. A number of students apparently had voiced displeasure over the quality of her class preparation and presentation, and she had refused to follow normal procedures in undertaking her responsibilities, i. e. she had refused to post the grades she awarded her students. These impressions were largely confirmed after the initial decision to not rehire her had been made, by a student evaluation that ranked her 46th of 48 teachers in the Business Department.[8]

The Court need not consider the accuracy of these administrative determinations, for it concludes that they were sincere and grounded on some evidentiary basis. In the absence of a finding that same were sexually motivated, the administration's professional judgment must be respected. Furthermore, the plaintiff has the burden of satisfying the Court to the contra, and this she has failed to do. The Court concludes therefore that Ms. Dyson's termination was not the product of sex discrimination.

▇ Concluding, however, that a sex bias prompted Ms. Dyson to be *initially* hired at a position below here qualifications, the Court finds that she is entitled to

---

**7.** It was clear from the evidence that the final decision to terminate future relationships with Ms. Dyson was made with reference to the situation in the 1971–72 academic year. Her employment in 1972–1973 was a formalism

pursuant to implementing that decision. See text *supra* at 2.

**8.** See fn. 5, *supra*.

an award of back pay for the academic years of 1970–71, 1971–72, and 1972–73 so as to compensate her as if she had been hired and paid as an Assistant Professor in the College of Business. A calculation of her potential salary, including raises and summer school salary and excluding her actual salary, indicates that she is due $22,975.00.

■ The evidence presented to show class discrimination was largely statistical. Three former faculty members testified to a pattern of discrimination based on the use of women, especially faculty wives, as cheap labor on a temporary basis to fill the gaps left by the turnover in the ranks of the male professionals. To document the phenomena plaintiffs called a statistical expert, to which the defendants responded with a statistical expert of their own. The fundamental difference between the experts was created by their choice of available data on which to base their respective calculations.

The defendants' expert, in determining whether VPI's hiring rates are discriminatory, used as a base a "pool" of actual applicants for University positions. The plaintiffs' expert turned to nationally gathered data on the number of women available with specified qualifications. Using these bases, the plaintiffs' expert concluded that VPI has a "slight but statistically significant under-utilization of women." The plaintiffs' expert qualified his findings, however, by stating that women were over-utilized in the junior ranks and under-utilized in the senior ranks. The defendants' expert testified that more females were hired than would be expected from their availability. It is recognized that both data bases have significant problems. The use of the pool of actual applicants will not reflect on those applicants that were affirmatively discouraged from applying to the University by its officials, and the use of a nationally calculated pool fails to take into consideration differences in applicant rates due to the locale of the school and the school's over-all scholastic bent. The Court has an abiding feeling that the plaintiffs'

figures are high, and defendants' are low. Accordingly, since the plaintiffs show only a "slight" overall sexual bias, and their statistics indicate that at the level where most of the hiring takes place, in the junior ranks, that the University was hiring more females than should be expected, the Court must conclude that plaintiffs have not demonstrated that the University discriminates against women on the basis of their sex and hiring of faculty members.

There was also a discrepancy in the expert's testimony regarding the promotions given faculty members. The defendants' expert produced statistics indicating that of those *recommended* for promotion, females were promoted with greater frequency than would be expected from their percentage among those recommended. Plaintiffs' expert produced figures that purported to show women were not being promoted as frequently as should be expected. His data pool, however, was taken from those persons he defined to be eligible for promotion, *i. e.* those who had held their rank for two years without any promotion consideration. Again, both calculations are based on differing data pools, and each has significant problems. The defendants' expert's pool may ignore the effects of a potential University policy against recommending females for promotion, and the plaintiffs' expert's pool may grossly oversimplify a decision on whether or not to recommend a person for promotion in defining those that are "eligible" for promotion. Since the plaintiffs have not adduced evidence to support their definition of eligibility as based on University policy and/or past practices, they have failed to carry their burden of proof and the Court concludes that their argument must fail. In short, there simply is not sufficient evidence to conclude that the University discriminated on the basis of sex when awarding faculty promotions.

Finally, it is argued that females within a particular rank, *i. e.* Assistant Professor, are paid less than males of the same rank, and such differentials can only be explained by sex discrimination in favor of the males. The plaintiffs' expert testified that women

were making 8% less in average salaries than males. The difficulty, however, with such an analysis is that there is considerable variation of salary levels within rank. For example, salaries within rank are tied in significant part to the number of years of service to the University and/or to the profession. A tenured professor of twenty years will, and should, other things being equal, make more than a tenured professor of one year. Without such a breakdown, the plaintiffs' statistics are not meaningful. Furthermore, as was noted by the defendants, a substantial amount of the new hiring is done in the junior positions where females are being hired with appropriate frequency. The inference from this information is that females are typically newer to the advancement ladder, and, therefore, have, as a group not had sufficient time to reach the upper rungs within the senior positions. With a group as diverse as VPI faculty members, and with ranks as broad as those analyzed, a comparison of average salary figures is insufficient to establish sex discrimination against females.

In conclusion, the evidence presented does not establish that the class members suffered discrimination on the basis of their sex in either hiring, promotion, or salary levels at VPI.

An appropriate order will issue.