**Deborah Ann CARBONI, Plaintiff,**

**v.**

**J. Blair MELDRUM, D.V.M., Ph.D., D. Phillip Sponenberg, D.V.M., Ph.D., Don Waldron, D.V.M., and Rene Armstrong, Defendants.**

Civil Action No. 95–539–R.

United States District Court, W.D. Virginia, Roanoke Division.

Jan. 25, 1996.

---

Marc L. Fleischaker, Barbara S. Wahl, Jeanine M. Worden, Nicole Walthour, Arent, Fox, Kintner, Plotkin & Kahn, Washington, DC, for plaintiff.

Kay Kurtz Heidbreder, Virginia Polytechnic Institute & State University, Blacksburg, VA, Jerry D. Cain, Commonwealth of Virginia Special Assistant Attorney General, Blacksburg, VA, for defendants.

### MEMORANDUM OPINION

TURK, District Judge.

This cause of action stems from the circumstances surrounding Deborah Ann Carboni's dismissal from the veterinary program at the Virginia–Maryland Regional College of Veterinary Medicine at the Virginia Polytechnic Institute (VPI). Plaintiff contends that she was unconstitutionally strip searched in violation of the Fourth and Fourteenth Amendments and that she was denied due process under the Fourteenth Amendment as a result of actions occurring during her university Honor Board proceeding and Faculty Appeal. She also raises various violations of state law including common law battery, negligent and intentional infliction of emotional distress, and tortious interference with contract. Ms. Carboni sues the defendants in both their individual and official capacities, seeking damages and injunctive relief to gain readmission to the program. This court has subject matter jurisdiction over the federal question claims pursuant to 42 U.S.C. § 1983, and 28 U.S.C. § 1331, and supplemental jurisdiction over the pendant state claims under 28 U.S.C. § 1367. There is no diversity of citizenship jurisdiction be-

cause all the parties were residents of the Commonwealth of Virginia during the relevant period.

The case currently comes before the court on the defendants' Motion for Summary Judgment. The defendants contend that the search of Ms. Carboni's person was reasonable under the circumstances and that she was justifiably dismissed because of her poor academic performance. The court finds that the defendants' actions with respect to the search fall within the scope of qualified immunity, and that the plaintiff received all the process she was due during the Honor Board and Faculty Appeal stages. Summary judgment will be granted for the defendants on the plaintiff's federal claims.

### I.

After working on her Master's degree in veterinary neurotoxicology and neuropathology at VPI and securing Virginia residency, Deborah Ann Carboni began her course of study at the Virginia–Maryland Regional College of Veterinary Medicine (VMRCVM). The defendants are all state officials and employees of VPI and VMRCVM. Dr. J. Blair Meldrum is the Associate Dean of Academic Affairs, and also chairs the Faculty Review Board and the Academic Standards Committee. Dr. D. Phillip Sponenberg is a professor at VMRCVM and the faculty advisor to the school's student Honor Board. Dr. Don Waldron is a professor at VMRCVM and Rene Armstrong is the Admissions Coordinator and the administrative assistant to Dean Meldrum.

The facts necessary for the court to rule on the defendants' Motion are set forth here in a light most favorable to the plaintiff. After beginning her veterinary medicine studies in 1991, Ms. Carboni experienced academic difficulty and fell below the grade point average necessary to continue at VMRCVM. However, the Admissions and Standards Committee allowed her to continue in the program provided that she re-take her first year. The plaintiff also began seeing the university's counselor for help with her alleged "test anxiety." Carboni successfully completed her first year course work in the Spring of 1993 and went on to finish her second year course of study in the Spring of 1994.[1] However, Ms. Carboni again encountered problems with her academic performance during her third year studies (the fourth year she was in the program).

In December, 1994, Carboni received failing grades on two examinations in "core" courses. The veterinary program requires that all students pass every core course, and not doing so can subject a student to dismissal. According to VMRCVM's College Handbook, a student who receives a failing grade in a core course may be allowed to retake the examination at the discretion of the faculty. Ms. Carboni was indeed allowed to retake both examinations and passed.

During the final semester of her third year Ms. Carboni again failed a final examination in a core course, this time in her Urology class. Dr. Waldron agreed to allow her to take a re-test and she was scheduled to do so on April 13, 1995. On that date Ms. Carboni arrived to take the examination and went to pick it up from Ms. Dreama Webb, the secretary for the Department of Small Animal Clinical Sciences. Carboni however, neglected to leave behind all exam preparation material as a note on the door from Dr. Waldron directed. Plaintiff maintains that Ms. Webb was not in her office so she went to the ladies' room to study. Her menstrual period had begun and she was feeling ill. Allegedly,

---

1. The plaintiff claims that in the spring of 1992, after she began associating more frequently with Dr. Mark Kukucka (a 1989 graduate of VMRCVM) she was questioned by various members of the faculty about the relationship. She also claims that she was frequently called into Dean Meldrum's office to discuss her "test anxiety" and that the Dean would ask her if that there was anything of a "personal nature" that might be causing her problems. Ms. Carboni alleges in her complaint that her association with Dr. Kukucka, whom she believes had fallen into displeasure with the faculty, lead to a "well orchestrated plan" to get her out of the program. In an effort to prove such claims, Plaintiff maintains that her father, Dan Carboni, discussed the problem with Dean Meldrum in the fall of 1993 and that Mr. Carboni was told by Dean Meldrum that his daughter's continued association with Dr. Kukucka might affect her standing at the school. Such allegations do not affect the court's consideration of the defendants' Motion for the reasons set forth herein.

Carboni remained in the bathroom for a while and then went back to Ms. Webb's office to get the exam and inadvertently left some of her notes on the bathroom floor in the process. Ms. Carboni obtained the exam and began it. She maintains that she then left the rest of the notes she had brought with her in a credenza drawer in the exam room.

Sometime after 2:00 p.m. the plaintiff alleges that she felt ill again and proceeded to the ladies' room, leaving a note on the conference room table to that effect. Ms. Carboni was in the bathroom for some time and Dr. Waldron became concerned. He sent Ms. Webb into the ladies' room to find out what was going on and Ms. Webb stated she saw someone in one of the stalls with notes arrayed around her on the floor.[2] Ms. Webb also stated that she heard the sound of "paper rustling" about the waist of Ms. Carboni when she left the bathroom. Webb reported what she saw and heard to Dr. Waldron who confronted the plaintiff and asked her if she had been cheating. Ms. Carboni denied the accusation and said that the only thing she had on her person was something of a "personal nature."

After the confrontation, Dr. Waldron reported the matter to Dean Meldrum and directed Ms. Webb to search the bathroom for notes. None were found at that time. Thinking that Ms. Carboni had hidden the notes on her person, Dean Meldrum and Dr. Waldron directed the plaintiff to go to the restroom with Ms. Webb and Defendant Rene Armstrong and submit to a body search. Carboni was directed to lift her shirt to expose her breast area and back, drop her pants to her knees to expose her waist area and to remove her boots. After she did so and after Ms. Armstrong conducted a "frisk" of Carboni's legs and chest, the plaintiff offered to remove more of her clothing, includ-

ing her undergarments, but Ms. Armstrong told her that would not be necessary. The search did not turn up the notes or any evidence of cheating. However, when the plaintiff returned to the conference room she was met by Dr. Waldron and Dean Meldrum who had since found the notes which the plaintiff had left there. The notes in the sanitary napkin disposal were also recovered.

Feeling that they had uncovered sufficient evidence of Ms. Carboni's alleged cheating, the plaintiff was not allowed to finish the exam and the entire matter was referred to the student Honor Board for investigation. On April 17, 1995, Ms. Carboni received written notice of the accusations against her and on April 26, 1995, she was told that a hearing would take place and that she was not to discuss the matter with anyone.[3] The hearing before the Honor Board was held on April 30, 1995.

Ms. Carboni claims that she was denied due process because of a whole series of occurrences taking place in connection with that hearing. First, she alleges that the date of the hearing itself, falling in the middle of an exam week, compromised her ability to properly prepare a defense. Carboni also claims that the admonition that she not speak with anyone about the matter was unnecessary and further compromised her ability to prepare her case. In addition, the plaintiff claims that the hearing was purposefully set on a date when Dean Meldrum was unavailable, rendering it impossible for her to confront her principal accuser, that the hearing was made public against her wishes, and that Dr. Sponenberg did not inform the student Honor Board that the proper standard of proof was beyond a reasonable doubt, as required by the Student Handbook.

Ms. Carboni was found guilty of cheating by the Honor Board and given a two block

2. Though Carboni claims that Ms. Webb could not have seen Ms. Carboni positioned in the stall as alleged, the plaintiff does not deny that she had classnotes with her in the bathroom in the first instance. Instead, Ms. Carboni claims that when she realized she left the notes in the bathroom she took them, and without looking at them, placed them in the sanitary napkin disposal between the lining and the wall where they were later found.

3. Plaintiff also claims that she was called at 10:00 p.m. on that day and accused of another Honor violation in connection with a re-test she had taken in March. However, Carboni does not say that allegation was ever pursued or that the phone call itself violated her constitutional rights in any way.

(six week) academic suspension. Plaintiff immediately advised the Board that she intended to appeal the decision to the Faculty Review Board, as permitted by VMRCVM's Honor Code. The plaintiff maintains that soon after the decision was announced she was told by her student counsel that he would not represent her at the appellate stage because Dr. Sponenberg had requested that he withdraw. As a result of this alleged withdrawal by her counsel, Ms. Carboni states that she was told her appeal would be postponed. During the time between the Honor Board proceeding and the appeal Ms. Carboni alleges that she entered into an agreement with Dean Meldrum that if she agreed to the faculty proposed postponement she would be allowed to take a second re-test of the Urology exam.

The appeal before the faculty board was finally set for May 12, 1995 in order to avoid conflict with the plaintiff's clinical schedule but was later postponed until May 31, 1995. In the meantime Ms. Carboni received a failing grade in Urology, a decision made at Dr. Waldron's discretion and not subject to any determination made by the student Honor Board. Dr. Waldron however, informed Ms. Carboni that the faculty decided, in its discretion, to allow her to take a second re-test if her appeal to the Faculty Review Board was successful.

On May 31, 1995, the appeal went forward and Ms. Carboni's student counsel from the Honor Board hearing did, in fact, continue his representation of the case. The plaintiff claims that several violations of due process took place at the appellate stage as well. First, she claims that Dr. Sponenberg's alleged tampering with her student counsel prejudiced her case. Second, she maintains that the faculty panel did not review the Honor Board proceeding record as required by the Honor Code.

The faculty panel upheld the Honor Board's six week suspension sentence and as a result, Dr. Waldron did not give Ms. Carboni a second re-test. Solely as a result of the failing grade she received in Urology, Ms. Carboni was dismissed from the veterinary program at VMRCVM and was later denied readmittance based on the totality of her academic performance while in attendance at the veterinary school. On June 6, 1995, the plaintiff timely filed this cause of action with the court.

## II.

The matter now comes before the court on the defendants' Motion for Summary Judgment. Federal Rule of Civil Procedure 56 states that summary judgment is proper when, "there is no genuine issue as to any material fact." The defendants bear the "initial burden of pointing to the absence of a genuine issue of material fact." *Temkin v. Frederick County Comm'rs,* 945 F.2d 716, 718 (4th Cir.1991), *cert. denied,* 502 U.S. 1095, 112 S.Ct. 1172, 117 L.Ed.2d 417 (1992), *citing, Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Any doubt as to a disputed fact should be resolved against the moving party. *Davis v. City of Portsmouth,* 579 F.Supp. 1205 (E.D.Va.1983), *aff'd,* 742 F.2d 1448 (4th Cir.1984). Here the defendants have come forward with sufficient evidence to show that they are entitled to qualified immunity to the extent they are sued in their individual capacities and that no material facts support a finding that Ms. Carboni is entitled to recover on her Fourth and Fourteenth Amendment claims. Even with the benefit of all her entitled presumptions, the plaintiff has still failed to meet her burden in opposition and the defendants are entitled to summary judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

## III.

Before looking to the specific facts of this case, the court must determine whether the defendants would be entitled to qualified immunity because that will shape the later inquiry. Surprisingly, whether VPI, and more specifically, VMRCVM is an arm of the state entitling it to sovereign immunity pursuant to the Eleventh Amendment is an issue Carboni contests. In support of its argument that VMRCVM is not an arm of the state, the plaintiff relies on the decision rendered in *Dyson v. Lavery,* 417 F.Supp. 103 (E.D.Va.1976) which, admittedly, dealt with

the question of Eleventh Amendment immunity as it applies to VPI. However, the plaintiff's attempts to distinguish VPI and VMRCVM from other Virginia colleges and universities which have been deemed arms of the state since the *Dyson* decision, are wholly unconvincing.

■ The court finds the district court decisions of *Richard Anderson Photography v. Radford University*, 633 F.Supp. 1154 (W.D.Va.1986), *aff'd*, 852 F.2d 114 (4th Cir. 1988), and *Jacobs v. College of William and Mary*, 495 F.Supp. 183 (E.D.Va.1980), *aff'd*, 661 F.2d 922 (4th Cir.), *cert. denied*, 454 U.S. 1033, 102 S.Ct. 572, 70 L.Ed.2d 477 (1981), controlling. After citing a long list of colleges and universities which have been determined to enjoy Eleventh Amendment immunity, the court in *Jacobs* determined that William and Mary was an arm of the state for immunity purposes. Though each state university must be considered on the basis of its own circumstances, *Soni v. Board of Trustees*, 513 F.2d 347, 352 (6th Cir.1975), *cert. denied*, 426 U.S. 919, 96 S.Ct. 2623, 49 L.Ed.2d 372 (1976), this court finds that VPI is identical to William and Mary on the basis of the factors listed in *Jacobs*. Both William and Mary and VPI have been public institutions of higher learning since their inception, serve the important governmental purpose of educating the "State's citizens and others," are controlled by Boards of Visitors who are appointed by the Governor, and are funded by the Commonwealth.[4] *Jacobs*, 495 F.Supp. at 189–90. Thus, this court finds that VPI and VMRCVM are entitled to Eleventh Amendment immunity just as are the College of William and Mary and Radford.

■ As a result of the foregoing, it is apparent that the defendant employees of VMRCVM enjoy qualified immunity for acts taken in their individual capacities, *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), and that they cannot be sued for damages for acts undertaken in their official capacities. *See Monell v. Department of Social Servs*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Under the doctrine, the discretionary decisions of school officials are backed by qualified immunity unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known. *Wood v. Strickland*, 420 U.S. 308, 323, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975); *see Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738. "In determining whether the specific right allegedly violated was 'clearly established' the proper focus is not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged." *Pritchett v. Alford*, 973 F.2d 307, 312 (4th Cir.1992).

### IV.

■ If there is a legitimate question as to whether an official's conduct violated the plaintiff's constitutional rights, the official is entitled to qualified immunity. *Tarantino v. Baker*, 825 F.2d 772, 774–75 (4th Cir.1987); *see also, Wiley v. Doory*, 14 F.3d 993, 995 (4th Cir.1994). Furthermore, the contours of the claimed right itself must be sufficiently clear that reasonable school officials would know what they did clearly violated that right. *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). Thus, qualified immunity protects all but the official who is plainly incompetent, or who knowingly violates the law. *Malley v. Briggs*, 475 U.S. 335, 344–45, 106 S.Ct. 1092, 1098, 89 L.Ed.2d 271 (1986). The defendants were reasonable in concluding that their search of the plaintiff's person was justified, either because of the applicable legal standard, or because of the specific facts of this case, and thus, are entitled to summary judgment based on qualified immunity. University officials, no less than the public school

---

4. In addition to claiming that VPI itself is not an arm of the state for Eleventh Amendment immunity purposes, Carboni maintains that even if VPI enjoyed immunity, the veterinary program's officials sued here do not. Apparently, the plaintiff believes that the effect on Virginia's treasury is limited in a constitutionally significant magnitude because VMRCVM exists as a result of a "regional contract" between the Commonwealth of Virginia and the state of Maryland. This claim is unavailing. The only ramification the regional nature of the veterinary program at VPI has is that its employees would be entitled to sovereign immunity because the treasuries of *both* states could be affected by any adverse monetary judgment.

administrators in *Wood* must be allowed to exercise their discretion in reliance on the factual information at their disposal at the time. *See Wood,* 420 U.S. at 319, 95 S.Ct. at 997.

The specific circumstances of the body search render this issue one of apparent first impression for any federal court. Unlike any prior cases of record, Plaintiff is a graduate student, not a public school pupil. Further, the search was conducted, not to uncover evidence of drugs or a crime, but because Ms. Carboni was suspected of cheating—a violation of school rules, not the penal code. As a result of the foregoing differences between this case and any precedent of which the court is aware, the court is not convinced that a search of a university graduate student undertaken by a faculty member, or at his direction, is *ever* justified if the student objects. However, neither can the court say that the defendants violated the plaintiff's *clearly established* constitutional rights because of the novelty of the issues presented here. *See Williams v. Ellington,* 936 F.2d 881 (6th Cir.1991) (emphasis added).

It should be noted that both the plaintiff and defendants cite the case of *New Jersey v. T.L.O.,* 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985), for the standard they believe this court should utilize. Even in the face of such apparent agreement the court approaches that question with great trepidation. However, regardless of the standard applied, the defendants are entitled to immunity because there is at least a legitimate question as to whether they violated any clearly established constitutional right the plaintiff possessed. *See Tarantino,* 825 F.2d at 774–75.

Before *T.L.O.* there was some disparity between courts as to whether public school officials needed to strictly comport with the warrant requirement of the Fourth Amendment, or at least meet probable cause standards before engaging in searches of their minor student charges. *See id.* at 331 n. 2, 105 S.Ct. at 738 n. 2.[5] The Court laid those

concerns to rest and firmly established that, though the Fourth Amendment protects the rights of students against encroachment by public school officials, *id.* at 334, 105 S.Ct. at 738; *see West Virginia State Bd. of Educ. v. Barnette,* 319 U.S. 624, 637, 63 S.Ct. 1178, 1185, 87 L.Ed. 1628 (1943), and that even a limited search of a person constitutes a substantial invasion of privacy, *T.L.O.,* 469 U.S. at 337, 105 S.Ct. at 740; *see Terry v. Ohio,* 392 U.S. 1, 24–25, 88 S.Ct. 1868, 1881–82, 20 L.Ed.2d 889 (1968), a warrantless search of a student by a school official would be constitutional if it was reasonably justified by all the surrounding circumstances. *T.L.O.,* 469 U.S. at 341, 105 S.Ct. at 742.

However, Justice White's reasoning in *T.L.O.* partially rested upon the age of public school students and the need for school officials, who are acting *in loco parentis,* to preserve authority over the environment they are charged with controlling. *See id.* at 342 n. 9, 105 S.Ct. at 743 n. 9; *see also, Tinker v. Des Moines Ind. Community Sch. Dist.,* 393 U.S. 503, 507, 89 S.Ct. 733, 737, 21 L.Ed.2d 731 (1969). "[T]he preservation of order and a proper educational environment requires close supervision of schoolchildren, as well as the enforcement of rules against conduct that would be perfectly permissible if undertaken by an adult." *T.L.O.,* 469 U.S. at 339, 105 S.Ct. at 741. With that in mind it is easy to see that a body search of a graduate student in her late twenties undertaken at the direction of a university professor and Dean is arguably different from the same search performed on a fourteen (14) year old high school freshman by a Vice–Principal. Though higher education administrators must be allowed to make discretionary decisions, *see Wood, supra,* university officials simply do not exercise the same level of disciplinary control over their students as do public school teachers and principals. Thus, there is some question as to whether a state university professor, as opposed to a public school administrator or teacher, could force a

---

5. *See e.g., Tarter v. Raybuck,* 742 F.2d 977 (6th Cir.1984) (held that a warrantless search is legal as long as there is a reasonable suspicion that the search will uncover evidence of an infraction of school disciplinary rules or a violation of the

law), *State v. Mora,* 307 So.2d 317 (La.), *vacated,* 423 U.S. 809, 96 S.Ct. 20, 46 L.Ed.2d 29 (1975), *on remand,* 330 So.2d 900 (La.1976) (held that a search of a student by a school official needed to be justified by probable cause).

student to subject herself to a search performed against her will.

In addition to the distinguishing factor of the plaintiff's age, this case does not involve the sort of general security concern generally at issue in the public school search cases. First, unlike the public school context, it may very well have been improper for Dr. Waldron and Dean Meldrum to order a search of Ms. Carboni's person if she was suspected of drug use or of some other criminal violation which did not immediately affect the safety of others. Such searches should properly be undertaken pursuant to the probable cause standard, and usually with the benefit of a warrant, by either the university's or the locality's police force. In that way, university students have a measurably higher expectation of privacy in their persons, papers, and effects than do similarly situated minors in public schools. Second, violations of school rules by students of any age do not raise the sort of public concern brought about by suspected engagement in criminal acts. This court can find no case which authorizes even public school officials to search their students suspected of cheating and so the court is unwilling to state that such a grave action as a search conducted against a university student's will would be justified by reasonable suspicion.

Further, the plaintiff is correct in directing the court's attention to the invasive nature of the search to which she was subjected. What may constitute reasonable grounds for the search of a locker or even a pocket or pocketbook may fall well short of what would be required to justify a search of a student's person. *Cornfield v. Consolidated High Sch. Dist.*, 991 F.2d 1316 1321 (7th Cir.1993). However, in the instant case, Dr. Waldron and Dean Meldrum had every justified reason to suspect that Plaintiff was cheating and the court cannot say that the defendants were unreasonable in believing that they could authorize a search of Ms. Carboni's person under the peculiar factual circumstances this case presents. *See Torchinsky v. Siwinski*, 942 F.2d 257, 260–61 (4th Cir. 1991).

First, Ms. Carboni was wrong to have classnotes with her in the exam room at all,

when the note on the door containing the instructions for the test from Dr. Waldron specifically directed her to discard such items before beginning the examination. Second, the plaintiff admitted to having those notes in the bathroom after spending an inordinately long amount of time there. That admission is corroborated by Ms. Webb who saw the plaintiff in the bathroom with the class notes arrayed around her. Those circumstances alone might justify some sort of questioning and search of Ms. Carboni by the Dean or Dr. Waldron. Add to the foregoing the fact that Ms. Webb heard the sound of paper rustling about Ms. Carboni's waist after she had left the bathroom and that the notes had since apparently disappeared from the bathroom, and it is readily apparent that the defendants were acting reasonably when they thought that a search of Ms. Carboni's person for the classnotes was justified. Ms. Carboni's explanations for all those facts do not serve to negate the likely conclusion that Dean Waldron and Dr. Meldrum drew from them—that the plaintiff was cheating on the exam and that she had hidden the notes seen in the bathroom in the waist of her jeans. The proper yardstick for this court to apply is what VMRCVM's administrators could have reasonably concluded they were entitled to do under the circumstances, not absolute certainty as the plaintiff would apparently have this court believe. *See Pritchett*, 973 F.2d at 312.

Nor was the scope of the search unreasonable once it was undertaken. The search conducted by Rene Armstrong and Ms. Webb at the direction of Dr. Waldron and Dean Meldrum, instead of by the two men themselves and, in addition, the body search of Ms. Carboni was strictly limited to turning up evidence of the suspected violation. In *Williams v. Ellington*, summary judgment was granted to school officials who conducted a strip search of a female student suspected of possessing cocaine. 936 F.2d 881. The scope of that search was strikingly similar to the one performed in the case before this court. There, just as here, the student/suspect was asked to lift her shirt, lower her jeans and remove her shoes and socks. *Id.* at 883. A similarly invasive search was also

deemed justified in *Cornfield*, 991 F.2d 1316. In that case a student suspected of "crotching" drugs was forced to remove all his clothing, put on a gym uniform, and allow visual inspection of his naked body by school administrators. *Id.* at 1319. Of importance to both the Seventh and the Sixth Circuits in upholding the grant of summary judgment was that the search was conducted by officials of the same sex as the suspected student. *Id.* at 1323; *Williams*, 936 F.2d at 883.

█ Even with a recognition that university students may possess a higher degree of privacy than their similarly situated minor counterparts, the court cannot say that such a distinction is clearly established, nor that the defendants should be so schooled in the intricacies of Fourth Amendment jurisprudence that they should be aware of the difference. *See T.L.O.*, 469 U.S. at 343, 105 S.Ct. at 743. A State official sued for violating the Fourth Amendment is entitled to qualified immunity if a reasonable person possessing the same information would have believed the conduct engaged in was lawful. *Shaw v. Stroud*, 13 F.3d 791, 801 (4th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 67, 68, 130 L.Ed.2d 24 (1994); *see also, Slattery v. Rizzo*, 939 F.2d 213, 216 (4th Cir.1991). There simply has been precious little, if any guidance applicable to the scope of authority possessed by state supported university faculty in this area. As a result of that, this court cannot say that the defendants' belief in their authority to conduct a search of Ms. Carboni's person was unreasonable considering the peculiar facts they were presented with at the time. The defendants are therefore, entitled to summary judgment based on qualified immunity on this point.

## V.

The defendants are also entitled to summary judgment on qualified immunity grounds because they were reasonably led to believe that the plaintiff's ready acquiescence to the search indicated her implied consent. Though the question of whether the plaintiff expressly consented to the search is in dispute,[6] the fact that she willingly cooperated with Ms. Armstrong, Dr. Waldron and Dean Meldrum is not. The undisputed fact is that Plaintiff followed Ms. Armstrong and Ms. Webb to the ladies' room without objection and then fully cooperated with the ensuing search. Not only did Carboni help Defendant Armstrong by lifting her shirt and dropping her jeans, she was willing to remove even more clothing and was told not to do so by Armstrong. With that in mind, it becomes apparent that the defendants reasonably believed they were asking Ms. Carboni to subject herself to a search of her person and that, though the search itself may not have been strictly welcome, the plaintiff did not object.

█ While granting summary judgment to the defendants based on the plaintiff's subjective state of mind may be inappropriate, for the purposes of qualified immunity the controlling question is what the defendants reasonably believed given the circumstances with which they were presented. In other words, the focus is on the defendants' state of mind, not the plaintiff's. *See Sevigny v. Dicksey*, 846 F.2d 953, 957 n. 5 (4th Cir.1988). Unlike the preceding question regarding the authority university officials possess to conduct searches, there is relevant authority on the question of whether plaintiffs are entitled to recover when alleging § 1983 suits involving Fourth Amendment violations and reasonable mistakes of fact

---

**6.** The court is inclined to agree, at least partially, with Carboni's argument on this point. This is not the sort of case in which consent itself can be the basis for granting summary judgment. Whether a consent to a search was voluntary or was the product of duress or coercion is normally a question of fact to be determined from the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226–27, 93 S.Ct. 2041, 2047–48, 36 L.Ed.2d 854 (1973). The plaintiff never affirmatively gave her consent to

be searched and though Ms. Carboni acquiesced to Ms. Armstrong's bodily investigation of her that does not mean Plaintiff relinquished her rights to later challenge its validity. *See Tarter v. Raybuck*, 742 F.2d 977, 980–81 (6th Cir.1984). However, the court is not dealing with a search conducted by a law enforcement official here and the authority that the defendants had over Ms. Carboni is limited in comparison so the questions of coercion and duress are not as controlling.

made by the officials conducting the searches.

■ In order to grant summary judgment to a defendant on a qualified immunity basis it is not necessary that the action undertaken be legally justified, just that the official in question reasonably believes he has the justification. *See e.g., Torchinsky*, 942 F.2d at 260–61. A reasonable mistake of consent is no less a factual error than relying on a facially valid warrant, or erroneously searching the wrong premises, and therefore, the proper course of action for this court is granting summary judgment on qualified immunity grounds. *See Mensh v. Dyer*, 956 F.2d 36, 39 (4th Cir.1991).

Common sense dictates that Ms. Carboni could have refused or given some indication of resistance the way she did when first accused by Dr. Waldron of cheating. The fact that she willingly submitted to the defendants' request thus, reasonably indicated that while the search may not have been "welcome" per se, it was at least acquiesced to by the plaintiff. Defendants Rene Armstrong, Dr. Waldron, and Dean Meldrum are therefore, entitled to summary judgment based on qualified immunity grounds, even if the search violated Ms. Carboni's rights pursuant to the Fourth Amendment because they reasonably believed that Plaintiff consented.

## VI.

■ In addition to seeking damages because of her allegedly violated Fourth Amendment rights, the plaintiff seeks injunctive relief, specifically, readmission to VMRCVM on the grounds that her Fourteenth Amendment due process rights were violated during the Honor Board hearing and subsequent appeal process.[7] The crux of Carboni's claim is that several specific events point to the conclusion that VMRCVM violated its own rules as set forth in the Student Handbook, specifically that: 1) the accused's

guilt be established beyond a reasonable doubt, 2) she was entitled to a confidential hearing which she allegedly did not receive, 3) the scheduling of the hearing inhibited her ability to properly defend herself, 4) she could not "confront" Dean Meldrum during the proceedings, and 5) the Faculty Review Board did not review the Honor Board transcript before rendering its decision upholding her six week suspension. At best, Plaintiff's claims lead to a conclusion that the defendants may have violated her procedural rights as guaranteed by *state* law. Such violations do not give rise to federal constitutional concern. *See Gray v. Laws*, 51 F.3d 426, 438 (4th Cir.1995); *Osteen v. Henley*, 13 F.3d 221, 224 (7th Cir.1993). On this point the Fourth Circuit has been clear:

> Alleged violations of due process in the deprivation of a protectable interest are to be measured against a federal standard of what process is due and that standard is not defined by state-created procedures, even when those state-created procedures exceed the amount of process otherwise guaranteed by the federal constitution. *Riccio v. County of Fairfax*, 907 F.2d 1459, 1469 (4th Cir.1990)

■ Federal guarantees of due process only require that a student faced with disciplinary charges at a university be given notice of the charges against her, and a reasonable opportunity to present her side of the story to a neutral decisionmaker. *Goss v. Lopez*, 419 U.S. 565, 581, 95 S.Ct. 729, 739–40, 42 L.Ed.2d 725 (1975); *see also, Board of Curators, Univ. of Missouri v. Horowitz*, 435 U.S. 78, 83–87, 98 S.Ct. 948, 952–53, 55 L.Ed.2d 124 (1978). No formalized process for a hearing has ever been mandated, let alone the trial-type evidentiary safeguards to which Plaintiff asserts she is entitled. *See id.* Thus, whether the Honor Board found Ms. Carboni guilty beyond a reasonable doubt or strictly followed other guidelines set forth in the student and faculty Handbooks

---

7. The defendant apparently does not contest the fact that the plaintiff has a protectable liberty or property interest in her schooling at VMRCVM. Since the matter has not been put at issue the court deems it admitted for the purposes of deciding this Motion. Further, the defendants cite *Ewing* in support of their Motion, a case which upheld a district court ruling that found university students have protectable property interests in their continued enrollment at publicly supported institutions of higher learning. *See Regents of the Univ. of Michigan v. Ewing*, 474 U.S. 214, 220, 106 S.Ct. 507, 510, 88 L.Ed.2d 523 (1985).

are not issues which concern this court. Plaintiff does not dispute that the Honor Board's members found her guilty of cheating, nor that she was given a reasonable opportunity to present her side of the story. The standards of due process were fulfilled and Ms. Carboni has no claim.

■ Nor has a federal due process right to a review of a disciplinary proceeding ever been articulated. *See id.* Again, Ms. Carboni does not point to any evidence that the Faculty Review Board was somehow constitutionally tainted, or that she was denied equal protection because of her gender or some other factor. Instead, she simply points to the fact that school rules required the Review Board to peruse the Honor Board hearing transcript before rendering a decision and that this was allegedly not the case here. Plaintiff has not set forth a federal claim in this Count of her Complaint either.

■ Even if the plaintiff was somehow denied due process she still would not be able to show she suffered any damage. The Honor Board's sentence—a six week suspension, was completely overborne by the independent and discretionary decision of the faculty to dismiss her from school entirely for receiving an F in Urology.[8] For a court to review discretionary decisions made by university faculty, the decision must represent a substantial departure from accepted academic norms so as to demonstrate that the faculty did not exercise professional judgment. *Ewing,* 474 U.S. 214, 227, 106 S.Ct. at 514. Even a decision that is unwise or conceivably in error does not run afoul of constitutional dictates. *Id.* at 227–28, 106 S.Ct. at 514–15. Considering all the circumstances— the plaintiff's initial inadequate academic performance during her first year of veterinary school, her failure of two courses in the fall semester of 1994, her initial failure of the Urology exam, and the fact that she was reasonably suspected of cheating, this court cannot say that the VMRCVM faculty abused

its discretion when it decided to dismiss Carboni.

### VII.

For the reasons set forth above, the defendants' Motion for Summary Judgment is granted on all the federal claims Ms. Carboni's raises pursuant to § 1983 alleging constitutional deprivations of her Fourth and Fourteenth Amendments rights. However, all of the claims Ms. Carboni brings under the auspices of state law are dismissed without prejudice because this court has not reached their merits. The case shall be stricken from this court's active docket.

---

**8.** Though Carboni claims she had an agreement with Dean Meldrum which allowed her to take a second re-test and points to the Faculty Handbook which says that she should have been allowed to finish the initial re-test in the first instance, both are state law claims, if at all and the court does not decide them here.